207 P.3d 709

Meyer TURKEN; Kenneth D. Cheuvront; James Iannuzo; Justin Shafer; Zul Gillani; and Kathy Rowe, Plaintiffs/Appellants/Cross–Appellees,

v.

Phil GORDON, in his official capacity as Mayor of the City of Phoenix; Dave Siebert, in his official capacity as member of the Phoenix City Council and Vice Mayor; Peggy Neely, in her official capacity as member of the Phoenix City Council; Peggy Bilsten, in her official capacity as member of the Phoenix City Council; Tom Simplot, in his official capacity as member of the Phoenix City Council; Claude Mattox, in his official capacity as member of the Phoenix City Council; Greg Stanton, in his official capacity as member of the Phoenix City Council; Michael Johnson, in his official capacity as member of the Phoenix City Council; Frank Fairbanks, in his official capacity as City Manager of the City of Phoenix; and City of Phoenix, Defendants/Appellees,

and

NPP CityNorth, L.L.C., Intervenor/Defendant-Appellee/Cross-Appellant.

No. 1 CA–CV 08–0310.

Court of Appeals of Arizona, Division 1, Department C.

Dec. 23, 2008.

Review Granted June 1, 2009.

Scharf–Norton Center for Constitutional Litigation, Goldwater Institute by Clint Bol-

ick, Carrie Ann Sitren, Phoenix, Attorneys for Plaintiffs/Appellants/Cross–Appellees.

Fennemore Craig by Timothy Berg, Andrew M. Federhar, Theresa Dwyer–Federhar, Scott J. Shelley, and Gary Verburg, City Attorney, Phoenix, Attorneys for Defendants/Appellees City of Phoenix.

Gammage & Burnham, P.L.C. by Lisa T. Hauser, Cameron C. Artigue, Heather J. Boysel, Phoenix, Attorneys for Intervenor/Defendant–Appellee/Cross–Appellant NPP CityNorth, L.L.C.

Mohr, Hackett, Pederson, Blakely & Randolph, P.C. by Gregory W. Falls, Phoenix, Attorneys for National Federation of Independent Business Small Business Legal Center Amicus Curiae.

## OPINION

IRVINE, Judge.

¶ 1 Meyer Turken and several other taxpayers and business owners ("Appellants") appeal from a superior court judgment declaring that an agreement entered into between the City of Phoenix ("City") and NPP CityNorth, L.L.C. ("CityNorth") did not violate several provisions of the Arizona Constitution. CityNorth filed a cross-appeal, arguing that Appellants lacked standing to challenge the City's actions. We find that the payments to CityNorth are prohibited by the Gift Clause of the Arizona Constitution, except for the payments made to set aside 200 "park and ride" parking spaces. Therefore, we reverse the judgment in part, affirm it in part, and remand to the trial court for further proceedings.

## FACTS AND PROCEDURAL HISTORY

¶ 2 CityNorth is a 144–acre, mixed-use development located in the Desert Ridge master-planned community. Desert Ridge was developed on a 99–year ground lease of state trust land near the Pima Freeway (Highway 101) and 56th Street in the City. The new development is designed to provide a critical mass of employment, shopping, residential, and recreational activities in a single densely developed project that will accommodate the City's growing population. CityNorth in-

formed the City that it could not develop the project as planned without financial support from the City, and requested that the City provide support sufficient to help bring about the project.

¶ 3 The City responded by committing to provide funds to the project through what it described as a parking space development and use agreement ("Agreement") with City-North. As stated by the City in its brief: "the City made this commitment to induce the Developer to build the development on a schedule and at a level that is more advantageous to the City than some other, differently configured project." By doing so, the City hoped to create a revenue stream for City-North that would assure that the project included a large retail component so that the City could capture and maximize retail sales tax revenues. The City was concerned that if the retail component were not built, the upscale retail tenants may have located in Scottsdale, resulting in less sales tax revenue for the City, including taxes on sales to the City's own residents. By the time negotiations between the City and CityNorth were underway, the major infrastructure for the area had already been constructed, so the City could not provide indirect assistance to the project by committing to build public roads, water or sewer lines, or other major off-project infrastructure.

¶ 4 In March 2007, the City adopted Ordinance No. S–33743 ("Ordinance"), which made certain findings pursuant to Arizona Revised Statutes ("A.R.S.") section 9–500.11 (2008). The Ordinance also authorized the City to enter into the Agreement with City-North. Tracking the terms of the statute, the Ordinance found that the development project would raise more revenue for the City than the total the City would have to pay, and that in the absence of the Agreement the project would not locate in the City in the same time, place, or manner. Pursuant to the Ordinance and A.R.S. § 9–500.11 the City could not enter into the Agreement until the findings of the City were verified by an independent third party. The City hired an economic consulting firm to verify its findings.

¶ 5 In particular the Ordinance contained the following terms and conditions:

A. Developer shall dedicate a minimum number of spaces in the parking structures to be constructed at the Project for long term use exclusively by the general public at no charge.

B. The City's payments under the Agreement will not begin until approximately 1,200,000 square feet of retail space has been completed and the Project is open for business.

C. The City's use payments will be calculated based upon market rates for the long term use of the public parking, which shall be prepaid in annual installments over a period not to exceed 11 years, 3 months or until the City has paid a total of $97,400,000, whichever first occurs.

D. The amount of each annual prepayment installment shall equal 50% of the sales tax actually collected by the City from the retail portion of the Project, subject to the foregoing limitation on the total amount of the City's payment obligation and the maximum payment period.

E. The Agreement may contain such other terms and conditions deemed necessary or appropriate.

Phoenix, Ariz., Ordinance S–33743 (March 5, 2007). The City and CityNorth executed the Agreement consistent with the Ordinance, specifying that CityNorth will grant the City 3,180 parking spaces within garages, including at least 200 parking spaces to be designated for public transportation or carpool riders. The grant is to last for a period of 45 years and allows the parking spaces to be open for use by the general public. Neither CityNorth nor the City may charge the general public for any use of the parking spaces pursuant to the Agreement. The Agreement specifies that the City's use of the parking places is nonexclusive, because there may be times when guests, customers, employees, vendors, and suppliers of the shopping center will occupy all of the spaces. The Agreement also provides that CityNorth has the right to change which spaces are designated for City use.

¶ 6 The Agreement states that the payments by the City were calculated based upon market rates for the long term use of structured public parking over forty-five years. The payments are to be made annually at an amount equal to fifty percent of the eligible privilege taxes as defined in the Agreement, but cannot exceed the $97,400,000 specified in the Ordinance. Eligible privilege taxes are defined as "the construction transaction privilege taxes and privilege taxes received by the City directly related to the business activities of amusement, commercial property rental, hotels and motels, job printing, publishing, rental of tangible personal property, residential property rental, restaurants and bars, retail sales, and use taxes collected from those improvements, as defined by Chapter 14 of the Code of the City of Phoenix." The City estimates that it will collect approximately $1 billion in taxes from businesses at the project over the 99–year term of the lease of state trust land.

¶ 7 Appellants are taxpayers and business owners that either do business or reside in the City of Phoenix. Appellants filed suit in superior court seeking to enjoin the City from making the payments provided for in the Ordinance and Agreement, arguing that they violated the Arizona Constitution. Specifically, Appellants argued violations of Article 2, § 13 ("Equal Privileges and Immunities Clause"), Article 4, pt. 2, § 19 ("Special Law Clause"), and Article 9, § 7 ("Gift Clause") of the Arizona Constitution. The superior court rejected each of these challenges. Consequently, the superior court granted summary judgment to the City and CityNorth, and denied the Appellant's motion for summary judgment. In a separate argument, CityNorth asserted that Appellants lacked standing to challenge the Ordinance and Agreement. The trial court did not address the standing issue, apparently considering it unnecessary to do so in light of its rejection of Appellants' substantive arguments.

¶ 8 In rejecting Appellants' Gift Clause argument, the superior court determined that the Agreement served various public purposes, including: the creation, retention, and expansion of retail uses and employment in the community; the stimulation of economic development in Phoenix; the genera-

tion of substantial additional sales tax revenues; the creation of significant, free public parking, which will encourage the use of public transportation; and the development of an urban core that will reduce congestion, traffic, and pollution. The court ruled that "taken individually, any of the stated benefits standing alone would likely qualify as a public purpose. Taken together, they undoubtedly do." The court went on to conclude that there was adequate consideration in the Agreement between CityNorth and the City. The court found that under the Agreement, the City will pay the developer one dollar for every two dollars that the City receives in sales taxes from the project. The court then concluded that the "consideration being paid by the public can never exceed the value to be received by the public, much less far exceed it." Because the court determined that the project would produce millions of dollars in sales taxes, the court concluded that there was adequate consideration for the Agreement. Therefore, the court concluded the agreement satisfied the Gift Clause.

¶ 9 On appeal, Appellants challenge the trial court's ruling that the Agreement does not violate the Gift Clause.[1] In a cross-appeal, CityNorth reasserts its argument that Appellants have no standing.

## DISCUSSION

### I. Standing.

¶ 10 CityNorth argues that Appellants lack standing to challenge the constitutionality of the City's actions. CityNorth argues that Appellants fail to show that they will pay any taxes at the CityNorth development, that they will pay higher taxes at their current locations, or that the City will suffer a pecuniary loss from the challenged transaction. Consequently, CityNorth urges that Appellants do not have standing in this case.

¶ 11 As a matter of sound judicial policy, courts require persons seeking redress to first establish standing, especially in actions in which constitutional relief is sought

against the government. *Bennett v. Napolitano*, 206 Ariz. 520, 524, ¶ 16, 81 P.3d 311, 315 (2003). "To gain standing to bring an action, a plaintiff must allege a distinct and palpable injury." *Sears v. Hull*, 192 Ariz. 65, 69, ¶ 16, 961 P.2d 1013, 1017 (1998). "An allegation of generalized harm that is shared alike by all or a large class of citizens generally is not sufficient to confer standing." *Id.*

¶ 12 Nevertheless, our supreme court has long-recognized that taxpayers may challenge a legislative act that expends monies for an unconstitutional purpose. *Ethington v. Wright*, 66 Ariz. 382, 386–87, 189 P.2d 209, 212 (1948); *see also Napolitano*, 206 Ariz. at 527, ¶ 30, 81 P.3d at 318. Because Appellants are Phoenix taxpayers and business owners who are challenging a City act that expends monies for an allegedly unconstitutional purpose, we conclude that they have standing in this instance.

### II. The Arizona Gift Clause.

¶ 13 We begin our analysis with the language of the Gift Clause, which provides:

Neither the state, nor any county, city, town, municipality, or other subdivision of the state shall ever give or loan its credit in the aid of, or make any donation or grant, by subsidy or otherwise, to any individual, association, or corporation, or become a subscriber to, or a shareholder in, any company or corporation, or become a joint owner with any person, company, or corporation, except as to such ownerships as may accrue to the state by operation or provision of law or as authorized by law solely for investment of the monies in the various funds of the state.

Ariz. Const. art. 9, § 7. The provision was originally adopted as part of a "variety of individual measures [to ensure], that the players in the economy were on a level field, and that government would not unfairly favor particular enterprises or individuals." John D. Leshy, *The Making of the Arizona Constitution*, 20 Ariz. St. L.J. 1, 96 (1988).[2] The

---

1. Appellants also challenge the trial court's rulings regarding the Equal Privileges and Immunity Clause and Special Law Clause of the Arizona Constitution. Because we find the Gift Clause

issue dispositive, we do not address those arguments.

2. *See generally,* Nicholas J. Wallwork and Alice S. Wallwork, *Protecting Public Funds: A History*

section has remained unchanged since statehood, except for the addition in 1998 of the final clause authorizing investment of state funds in equity securities. 1999 Ariz. Sess. Laws Vol. 2, Election Results Proposition 102, pp.1928–31 (reflecting the adoption by the voters of Proposition 102 at the November 2, 1998 general election). As recently as 2004, voters rejected an attempt to amend the Gift Clause to allow governmental entities to acquire ownerships and securities in consideration for the license or transfer of technology or intellectual property created or acquired by the universities. *See* Ariz. Const. art. 9, § 7, historical and statutory notes (Supp.2008) (rejecting Proposition 102, based on Laws 2003, H.C.R. 2028).

¶ 14 Our supreme court has recognized several purposes of the Gift Clause. First, "to avoid the 'depletion of the public treasury or inflation of the public debt by engagement in nonpublic enterprise.'" *Kromko v. Ariz. Bd. of Regents,* 149 Ariz. 319, 320, 718 P.2d 478, 479 (1986) (quoting *Town of Gila Bend v. Walled Lake Door Co.,* 107 Ariz. 545, 549, 490 P.2d 551, 555 (1971)). Next, "[p]ublic funds are to be expended only for 'public purposes' and cannot be used to foster or promote the purely private or personal interests of any individual." *Id.* at 321, 718 P.2d at 480 (emphasis omitted).

■ ¶ 15 Early in our history, our supreme court explained the background for the Gift Clause:

It represents the reaction of public opinion to the orgies of extravagant dissipation of public funds by counties, townships, cities, and towns in aid of the construction of railways, canals, and other like undertakings during the half century preceding 1880, and it was designed primarily to prevent the use of public funds raised by general taxation in aid of enterprises apparently devoted to quasi public purposes, but actually engaged in private business.

*Day v. Buckeye Water Conservation & Drainage Dist.,* 28 Ariz. 466, 473, 237 P. 636, 638 (1925) (quoting *Thaanum v. Bynum Irr. Dist.,* 72 Mont. 221, 232 P. 528, 530 (1925)); *see also State v. Nw. Mut. Ins. Co.,* 86 Ariz. 50, 53, 340 P.2d 200, 201 (1959) (quoting same language). More recently, the court has stated:

The constitutional prohibition was intended to prevent governmental bodies from depleting the public treasury by giving advantages to special interests or by engaging in non-public enterprises. Of course, either objective may be violated by a transaction even though that transaction has surface indicia of public purpose. The reality of the transaction both in terms of purpose and consideration must be considered. A panoptic view of the facts of each transaction is required.

*Wistuber v. Paradise Valley Unified Sch. Dist.,* 141 Ariz. 346, 349, 687 P.2d 354, 357 (1984) (citations omitted); *see Webster's Third New International Dictionary* 1631 (2002) ("panoptic ... 1: comprising all in one view: all-seeing ... 2: permitting everything to be seen"). Although we are deferential to legislative findings, "we must not merely rubber-stamp the legislature's decision." *Ariz. Ctr. for Law in the Pub. Int. v. Hassell,* 172 Ariz. 356, 369, 837 P.2d 158, 171 (App.1991).

■ ¶ 16 Our courts have applied the Gift Clause in a variety of cases over the years, none of which is exactly on point with this transaction. Most Gift Clause challenges to governmental actions have been rejected, but enough have been sustained to show that the clause has force. Decisions by this court and our supreme court rejecting Gift Clause challenges to governmental actions fall into several categories. First, the Gift Clause is satisfied when the expenditures improve, assist, or define government operations and administration.[3] Within this category, we

of Enforcement of the Arizona Constitution's Prohibition Against Improper Private Benefit from Public Funds, 25 Ariz. St. L.J. 349 (1993); David E. Pinsky, State Constitutional Limitations on Public Industrial Financing: An Historical and Economic Approach, 111 U. Pa. L.Rev. 265 (1963). We have also examined the records of the constitutional convention, but the recorded discussions dealt only with the procedures associat-

ed with adopting the provision, not its substance. See John S. Goff, The Records of the Arizona Constitutional Convention of 1910, 86, 485–89 (1990).

3. See Wistuber, 141 Ariz. at 348–50, 687 P.2d at 356–58 (holding that a collective bargaining agreement between a school district and teachers' association, which released the association

include cases upholding pension benefits and compensation for services rendered because of the public purpose of maintaining and recruiting a valuable workforce.[4]

¶ 17 Second, expenditures to promote the health and welfare of citizens will not constitute donations or subsidies, "even though the effect is felt by a given class more than by the community at large."[5] Within this category of promoting health and wel-

fare, a line of cases has upheld transactions in which government has sought to effectively privatize, in whole or in part, the operation of hospitals.[6]

¶ 18 The supreme court has also rejected several challenges to government actions because there was no transfer of public funds or property, and thus no donation or grant under the Gift Clause.[7] Government ownership or control of property has been cited on

president from the duty to teach, was valid because the services performed by the president aided the district in performing its obligations); *Schrey v. Allison Steel Mfg. Co.*, 75 Ariz. 282, 288, 255 P.2d 604, 608 (1953) (upholding five percent preference granted to contractors who had paid county and state taxes for two years immediately preceding making a bid); *City of Glendale v. White*, 67 Ariz. 231, 235, 238, 240, 194 P.2d 435, 438, 440, 441 (1948) (holding that payment of dues for a municipal league was for a public purpose when the league fostered the adoption of sound methods of municipal government, administration, and conduct of municipal affairs among other things); *Udall v. State Loan Bd.*, 35 Ariz. 1, 5–12, 273 P. 721, 723–25 (1929) (permitting the state to discharge a moral obligation against it based on equity and justice, even though the claim was not legally enforceable); *Fairfield v. Huntington*, 23 Ariz. 528, 531–41, 205 P. 814, 815–18 (1922) (same); *see also State v. Heinze*, 196 Ariz. 126, 129–30, ¶¶ 12–15, 993 P.2d 1090, 1093–94 (App.1999) (finding that there was a reasonable argument that an employee committed wrongful acts within the scope of his employment; expenditure of public funds to defend him was not prohibited); *Maricopa County v. State*, 187 Ariz. 275, 279–81, 928 P.2d 699, 703–05 (App.1996) (finding that a modification to procedures for claiming agricultural tax classification for prior years served the public purpose of protecting farmland from disproportionate tax bills).

4. *See Rochlin v. State*, 112 Ariz. 171, 177, 540 P.2d 643, 649 (1975) (holding that pension plans are not gifts, but part of the contemplated compensation for employee services); *Yeazell v. Copins*, 98 Ariz. 109, 113, 402 P.2d 541, 544 (1965) (holding that a pension is not a gratuity or gift when the pension provision is part of a statute that contemplated the pension as part of the compensation for services rendered); *McClead v. Pima County*, 174 Ariz. 348, 358–59, 849 P.2d 1378, 1388–89 (App.1992) (holding that post-retirement benefit increases serves several public purposes, i.e. to protect the economic security of retired public servants and serve as a recruiting inducement for prospective employees); *Fund Manager, Pub. Safety Pers. Ret. Sys. v. Corbin*, 161 Ariz. 348, 363, 778 P.2d 1244, 1259 (App.1988) (holding that amendment to statute exempting contracts for goods and services retroactively

from requirements of procurement code did not constitute making of donation), *aff'd* 161 Ariz. 364, 778 P.2d 1260 (1989); *Burke v. Ariz. State Ret. Sys.*, 152 Ariz. 323, 326, 732 P.2d 214, 217 (App.1986) (holding that pension plans for public employees are for a public benefit).

5. *Humphrey v. City of Phoenix*, 55 Ariz. 374, 387, 102 P.2d 82, 87 (1940) (holding that slum clearance projects are adopted for self-protection against crime and disease, and that money spent for these purposes is for the public good and welfare); *see also Indus. Dev. Authority of the County of Pinal v. Nelson*, 109 Ariz. 368, 374, 509 P.2d 705, 711 (1973) (holding that revenue bonds sold to fund pollution control facilities were for the public purpose of protecting the health of citizens by preventing or limiting air, water, and other forms of pollution); *Walled Lake Door Co.*, 107 Ariz. at 550, 490 P.2d at 556 (holding that supplying water for fire suppression preserved and protected lives and property and was a public purpose); *City of Phoenix v. Superior Court*, 65 Ariz. 139, 144, 175 P.2d 811, 814 (1946) (holding that the erection of temporary housing for war veterans and their families through expenditure of municipal funds was spent to prevent crime and disease and was for a public good and general welfare).

6. *Kromko*, 149 Ariz. at 321, 718 P.2d at 480 (holding that leasing property to a non-profit hospital for $10 a year serves the public good and general welfare and is therefore a public purpose); *S. Side Dist. Hosp. v. Hartman*, 62 Ariz. 67, 71–72, 153 P.2d 537, 538–39 (1944) (upholding city's lease of property to nonprofit corporation to operate a hospital for a nominal rent); *see also Heiner v. City of Mesa*, 21 Ariz. App. 58, 64, 515 P.2d 355, 361 (App.1973) (holding that transfer of real estate on which hospital was located was for the public good and general welfare; rationale confined to its facts in *Wistuber*).

7. *Kotterman v. Killian*, 193 Ariz. 273, 288, ¶ 52, 972 P.2d 606, 621 (1999) (holding income tax credit is not a gift); *State v. Roseberry*, 37 Ariz. 78, 88, 289 P. 515, 519 (1930) (finding garnishment of state employee would not involve public funds).

several occasions as evidence that there is no Gift Clause violation.[8]

¶ 19 Not every payment or conveyance has been upheld. In some cases, the courts have found that a transfer of money or property amounted to a donation or grant that did not serve a public purpose.[9] Other cases have found the consideration given in return for the government's funds or property to be inadequate.[10]

¶ 20 Our supreme court has recognized that by adopting the Gift Clause the drafters of our constitution "never thought that the state and local governments should be prohibited from dealing with private enterprises, as, for instance, in acquiring goods and services required to furnish and sustain governmental functions." *Nw. Mut.*, 86 Ariz. at 53, 340 P.2d at 202; *see also City of Tombstone v. Macia*, 30 Ariz. 218, 224, 245 P. 677, 680 (1926) ("It should be noted that the existence of an element of business profit is

not sufficient to determine whether the proposed activity is for a public purpose or not."). Without such transactions it would be difficult for government to hire employees, buy or lease land, purchase supplies, or engage in countless other everyday transactions. Consequently, government entities are given considerable discretion in carrying out their functions, because strict judicial oversight regarding whether too high a price is being paid for supplies or a better deal could be found somewhere else would constitute a deterrent to entering into any transaction. The Gift Clause is not intended to reach so far.[11]

¶ 21 At one point, a decision by this court held that if a transaction served a public purpose, the transaction would not violate the Gift Clause because the public benefits would constitute valid and valuable consideration. *Heiner*, 21 Ariz.App. at 64, 515 P.2d at 361.[12] Another panel of this court disa-

---

**8.** *Kromko*, 149 Ariz. at 322, 718 P.2d at 481; *Walled Lake Door Co.*, 107 Ariz. at 549, 490 P.2d at 555.

**9.** *See Graham County v. Dowell*, 50 Ariz. 221, 226, 71 P.2d 1019, 1021 (1937) (holding that expenditure of state money on a road that was never established as a state or county highway amounted to an expenditure on a private right of way and therefore a gift); *Puterbaugh v. Gila County*, 45 Ariz. 557, 564, 46 P.2d 1064, 1067 (1935) (holding that statute, which relieved persons of reimbursement payments they were legally obligated to make to the state, amounted to a gift); *Duke v. Yavapai County*, 24 Ariz. 567, 573, 211 P. 862, 864 (1923) (holding that money which had been paid by the purchaser of certain property at a tax sale, in reliance on the statement of certain officials of the county that title to the property purchased was good, created no legal or moral obligation on the county to return the money paid when the title was found to be no good); *Rowlands v. State Loan Bd. of Ariz.*, 24 Ariz. 116, 123, 207 P. 359, 361 (1922) (holding that a statute, which relieved mortgagors of duty to pay government for no other reason than the inability of the mortgagor to pay, was a gift in violation of the Gift Clause).

**10.** *Hassell*, 172 Ariz. at 370, 837 P.2d at 172 (holding that statute, which relinquished state's interest in riverbed lands claimed by state under public trust doctrine, was a gift without adequate consideration); *City of Tempe v. Pilot Properties, Inc.*, 22 Ariz.App. 356, 527 P.2d 515 (1974) (holding a valid public purpose exists when a city transfers land for the construction of a baseball stadium that will become city property, but find-

ing an issue of fact existed as to the adequacy of the consideration).

**11.** *See Valley Nat. Bank of Phoenix v. First Nat. Bank of Holbrook*, 83 Ariz. 286, 296, 320 P.2d 689, 695 (1958) (rejecting the argument that bank deposits by a government are prohibited extensions of credit under the Gift Clause because in a strict legal sense a deposit of public funds constitutes a loan and indirectly aids and benefits the depository).

**12.** The Arizona Constitution expressly includes the public purpose doctrine as a general prerequisite to any expenditure of tax revenues. Ariz. Const., art. 9, § 1 (stating that "all taxes ... shall be levied and collected for public purposes only"). In applying this provision soon after statehood, our supreme court found it necessary to ask: "What is, and what is not, a public purpose?" *Macia*, 30 Ariz. at 222, 245 P. at 679. After citing numerous examples, the court found itself unable to give an exact answer.

> The question of what is a public purpose is a changing question, changing to suit industrial inventions and developments and to meet new social conditions. Law is not a fixed and rigid system but develops, a living thing, as the industrial and social elements which form it make their impelling growth.

*Id.* at 226, 245 P. at 680; *see also Wistuber*, 141 Ariz. at 348, 687 P.2d at 356 ("[T]he term 'public purpose' is incapable of exact definition and changes to meet new developments and conditions of times."); *White*, 67 Ariz. at 236, 194 P.2d at 439 (noting that because the term public pur-

greed with this analysis, holding that because a private entity "uses public funds or property for a 'public purpose' is not sufficient, in and of itself, to remove that use from the provisions" of the Gift Clause. *Pilot Properties*, 22 Ariz.App. at 362, 527 P.2d at 521. Disagreeing with *Heiner*, *Pilot Properties* held that an additional factor to be considered was what the public body received in return from the private party. We concluded that if the consideration received is inadequate, a gift or donation may exist. *Id.* at 363, 527 P.2d at 522.

¶ 22 The supreme court resolved the conflict between the two court of appeals decisions in *Wistuber*, where it specifically adopted the rule expressed in *Pilot Properties*. *Wistuber*, 141 Ariz. at 348, 687 P.2d at 356. *Wistuber* involved a school district's agreement with its local teachers' association in which the district released the association president from teaching duties, but continued to pay a portion of the president's salary. *Id.* In return, the president agreed to pursue a number of activities and undertake duties that inured to the direct benefit of the district, i.e. attend school board meetings as spokesperson for the teachers, assist teachers in their awareness of procedures, assist in the process of grievances, appoint teachers to district committees, confer with district administrators on areas of concern, etc. *Id.* The court found that the services performed by the president on behalf of the association aided the district in performing its obligations, and therefore served a public purpose. *Id.* at 349–50, 687 P.2d at 357–58.

¶ 23 The court also held, however, that merely finding a valid public purpose for an expenditure is not enough to satisfy the Gift Clause. Courts must also look to the adequacy of the "public benefit to be obtained from the private entity as consideration for the payment or conveyance from a public body." *Id.* at 349, 687 P.2d at 357. "[I]n reviewing such questions, the courts must not be overly technical and must give appropriate deference to the findings of the governmental body." *Id.* The court found that the substantial duties imposed on the association president were not disproportion-

ate to the modest sums paid by the district, so the challengers failed to meet their burden of proof. *Id.* at 350, 687 P.2d at 358. Consequently, the court concluded that the Gift Clause was not violated "because (1) the agreement serves a public purpose and (2) there is neither a donation *nor* subsidy to a private association." *Id.* at 348, 687 P.2d at 356.

¶ 24 Thus, applying *Wistuber*, transactions that directly benefit a private party may be permitted so long as the "public benefit to be obtained from the private entity as consideration for the payment or conveyance from a public body" is not "far exceeded by the consideration being paid by the public." *Id.* at 349, 687 P.2d at 357. Simple examples of such transactions include purchases of supplies, land, or services that will be used by the government to carry out a public purpose. If the value of what is given by the government does not far exceed the value of what is given back by the other party to the contract, the payment will not be an improper donation.

¶ 25 Quoting this court's decision in *Maricopa County v. State*, Appellees argue that *Wistuber* established a two-prong test for reviewing transactions under the Gift Clause: "[A] use of public money or property will not violate the Gift Clause if, taking a 'panoptic' view of the transaction in question, a court concludes that (1) the use is for a public purpose, and (2) the value of the public money or property is not so much greater than the value of the benefit received by the public that the exchange of the one for the other is disproportionate." 187 Ariz. at 279–80, 928 P.2d at 703–04, citing *Wistuber*, 141 Ariz. at 349, 687 P.2d at 357. Appellants agree with this test, but add, citing *Kromko* and pre-*Wistuber* cases, that the Gift Clause must be applied to prevent public funds from being used "to foster or promote the *purely private or personal interests of any individual.*" *Kromko* 149 Ariz. at 321, 718 P.2d at 480. The City and CityNorth disagree, arguing that *Wistuber* established a definitive and exclusive test that makes any earlier cases or other factors irrelevant.

pose is incapable of exact definition, it is better
"elucidated by examples.").

¶ 26 Initially, we reject the argument that we should not look to pre-*Wistuber* cases for guidance in interpreting the Gift Clause. We do not read *Wistuber* as representing a change in the supreme court's Gift Clause jurisprudence, but simply a clarification of the factors to be considered. Consequently, until expressly overruled, the supreme court's other opinions interpreting the Gift Clause are highly instructive. Moreover, we cannot ignore *Kromko*, which was decided after *Wistuber*. In *Kromko*, the supreme court cited several pre-*Wistuber* cases as authority for its analysis. Given that the supreme court itself continues to look to its previous decisions for guidance, we see no reason not to do the same.

¶ 27 This leads us to the two-prong test the parties assert was established in *Wistuber*. We recognize that this court has described *Wistuber* as setting out this test. Nevertheless, upon careful re-reading of the opinion in *Wistuber*, and the supreme court's later opinion in *Kromko*, we conclude that the supreme court itself did not adopt that test. As noted above, in *Wistuber* the supreme court based its ultimate holding that there was no Gift Clause violation on its conclusion that (1) there was a public purpose and (2) there was neither a donation nor subsidy to a private party. It used virtually the same language in *Kromko* to describe its holding. In each case, the supreme court analyzed the presence or absence of consideration as a factor in determining that there was no donation or subsidy, but nothing in either opinion indicates an intention to limit the relevant factors to public purpose and consideration.

¶ 28 In *Wistuber*, the supreme court determined that there was no unconstitutional donation or subsidy because it found the school district received adequate consideration for the small amount it paid to the teachers' association president. In that context, consideration was the deciding factor. We do not, however, read the *Wistuber* discussion of

consideration as defining the exclusive way to determine if a payment is a donation or subsidy. Specifically, we see no intent to preclude considering whether the payments to a private party unduly promote private interests. In *Wistuber*, there was simply no need to analyze whether the payments promoted private interests because it was apparent that they did not. The payments made to the president of the teachers' association allowed the president to engage in school-related activities instead of being in a classroom. There was no evidence that either the president or the association was engaged in business activities unrelated to the school district. Indeed, the entire purpose of the association was to relate to the district on behalf of the teachers. Under these circumstances, public purpose and consideration were the deciding factors.[13]

¶ 29 The supreme court's analysis in *Kromko* shows that in a different case public purpose and consideration are not the exclusive factors; the extent to which private interests are implicated must also be considered. *Kromko* addressed the legality of a lease between the Arizona Board of Regents ("Board") and a nonprofit corporation formed by the Board to take over operations of the University of Arizona Hospital. *Kromko*, 149 Ariz. 319, 718 P.2d at 478. After discussing the purposes of the Gift Clause, the court found that the operation of a hospital by a nonprofit corporation served a public purpose, citing a statute that specifically allowed such a lease. *Id.* at 321, 718 P.2d at 480. The court then analyzed whether any "private or personal interests of any individual" would be served by the operation of the hospital. *Id.* The court considered the corporate structure of the corporation, the fact that it was required to obtain Board approval for many of its operations, and its obligation to report to the Board. *Id.* The court explained:

> Most importantly, however, no earnings of the nonprofit corporation, other than rea-

13. In *Kotterman*, the supreme court rejected the argument that a tax credit was an unconstitutional gift. Citing *Wistuber*, its analysis stated in part: "We have upheld giving when the state action served a public purpose and adequate consideration was provided for the public benefit conferred." 193 Ariz. at 288, ¶ 51, 972 P.2d at 621. In light of the more complete analysis in *Wistuber* and *Kromko*, we do not read this as expressing an intention by the supreme court to foreclose analysis of whether a transaction unduly promotes private interests.

sonable compensation for services, shall be distributed to the corporation's members, directors or officers. Moreover, upon dissolution or liquidation, all net assets of the nonprofit corporation shall revert to the Board or its successors.

In other words, UMCC is an independent corporation, free to operate in a competitive market without the normal constraints usually placed on the state. Nevertheless, its operations are still subject to the control and supervision of public officials. Hence, we believe the fear of private gain or exploitation of public funds envisioned by the drafters of our constitution is absent. . . .

*Id.* In effect, the court reviewed the means chosen to carry out the public purpose and found they did not violate the Gift Clause because no "private or personal interests of any individual" would be served.

¶ 30 Only after reaching this conclusion did the court in *Kromko* move on to analyze whether there was adequate consideration, and in this discussion it cited *Wistuber* for the first time. The court found that the consideration was adequate because of a statutory presumption that the property was transferred for fair value and the evidence showed that the Board received substantial monetary and some nonpecuniary benefits. *Id.* at 322, 718 P.2d at 481. In light of all these factors, the court concluded that "the agreement (1) serves a statutorily recognized public purpose, and (2) constitutes neither a donation nor a subsidy to a private corporation," so there was no violation of the Gift Clause. *Id.*

 ¶ 31 In light of *Wistuber* and *Kromko*, we believe that public purpose and consideration are factors to be considered in applying the Gift Clause, but we agree with Appellants that we must also consider wheth-

er any private or personal interests are being served by the transaction. Taking all of these factors into account not only firmly anchors our analysis in the actual holdings of *Wistuber* and *Kromko*, but it is consistent with the language of the Gift Clause, which specifically prohibits "any donation or grant, by subsidy or otherwise, to any individual, association, or corporation." Considering each of these factors is also consistent with the purposes of the Gift Clause expressed by our supreme court, which include not only avoiding depletion of the public treasury, but also avoiding the promotion of purely private interests of a private entity. Thus, it is appropriate for Gift Clause purposes to look at not only the purpose of the expenditure and what the public body receives in return, but how the purpose is carried out.[14]

 ¶ 32 Therefore, we conclude that *Wistuber* did not adopt the definitive two-prong test upon which the parties seek to rely. To the extent that some of our cases interpreted *Wistuber* as creating a test that measured only public purpose and consideration, those interpretations were based on a misreading of the supreme court's opinions.[15]

 ¶ 33 Thus, as directed by the supreme court, we must consider the realities of the transaction to determine if the means chosen by a public body to achieve a public purpose violate the Gift Clause by unduly promoting private interests. We do so by considering several questions about the disputed transaction. Is money paid or property transferred to a private enterprise? What is the direct object of the public payment, not just its indirect effects? Are the claimed benefits merely the result of private activities, or do they directly result from the government's actions? Does the public expenditure purchase property that will be owned or controlled by the government? Do the funds

---

14. The prohibitions in the Gift Clause against loaning of credit or the owning of stock in a private company also limit how the government goes about its business, not simply whether the ultimate purpose sought to be accomplished is appropriate or a transaction results in significant benefits to the public.

15. This does not mean, however, that the analysis or results in those cases were incorrect. Just

as in *Wistuber*, considering public purpose and consideration may have been all that was necessary to decide the case. Nevertheless, in cases in which payments are to be made to private persons for private ends, we take a broader view. In such cases we must also consider whether any "private or personal interests of any individual" are being served by a transaction.

provide a public service, or employ staff or agents who provide such a service? Do the payments pay a private party to engage in private business? The answers to these questions will inform our analysis regarding whether any private or personal interests of any individual are being served, which, as shown by our supreme court in *Kromko*, is a question that we must address in addition to public purpose and consideration.[16]

¶ 34 With this general framework in mind, we now turn to the specifics of the Agreement. Appellees argue at least five public purposes are served by the Agreement between the City and CityNorth:

- Creation, retention, and expansion of retail uses and employment in the community;
- Development of an urban core to reduce congestion, traffic, and pollution;
- Stimulation of economic development in the City;
- Generation of substantial additional sales tax revenues; and
- Creation of significant free public parking, including a park and ride facility to encourage the use of public transportation.

¶ 35 The City asserts that under the Agreement it will never pay more than the 2007 market rate for the parking. Moreover, the City's obligation to make any payments is contingent on the construction of at least eighty-five percent of the 1.2 million square feet of retail space at CityNorth and parking garages with at least 3,180 spaces for public use. Only after the required construction is

complete will the City begin making payments equal to fifty percent of the sales taxes actually collected by the City from the City-North project. The City will make such payments for no more than eleven years and three months, or until the total payments reach $97.4 million, whichever occurs first.

¶ 36 Appellants assert that the Agreement does not serve a public purpose for Gift Clause purposes. They argue the payments are simply a massive subsidy given to a private business owner to construct a private shopping center, as well as a parking garage that will serve retail businesses and their patrons. They acknowledge that the development will provide benefits to the community, but argue that those benefits cannot justify a grant or donation that is prohibited by the Gift Clause.

¶ 37 Appellees argue that determining whether the Agreement serves a public purpose is simple because a state statute specifically authorizes the Agreement. Appellees cite A.R.S. § 9–500.11, which was enacted in 2005 to authorize retail development sales tax agreements that allowed tax revenues to be paid to developers. Citing several court decisions that relied on statutes to find a proper public purpose, they argue compliance with the statute should equate to serving a public purpose. While we recognize that furthering public policies contained in statutes is relevant to Gift Clause analysis, we do not find it conclusive here. First, legislative policy regarding tax agreements is not consistent. In 2007, the legislature enacted A.R.S. § 42–6010 (Supp.2008), which

16. Interpretations of other states' versions of gift clauses, and the more general requirement that public funds only be spent to serve a public purpose, have varied significantly depending upon the specific language at issue and its history. *See generally* Thaddeus L. Pitney, *Loans, and Takings, and Buildings—Oh My!: A Necessary Difference Between Public Purpose and Public Use in Economic Development*, 56 Syracuse L.Rev. 321 (2006); Richard Briffault, *The Disfavored Constitution: State Fiscal Limits and State Constitutional Law*, 34 Rutgers L.J. 907 (2003); Nick Beermann, *Legal Mechanisms of Public–Private Partnerships: Promoting Economic Development or Benefiting Corporate Welfare?*, 23 Seattle U.L.Rev. 175 (1999); Dale F. Rubin, *Public Purpose in the Northwest: A Sinkhole of Judicial Interpretation—The Case for Alternatives in the Delivery of Public Services and the Granting of Subsidies*, 32 Idaho L.Rev. 417 (1996); David D. Martin, *Washington State Constitutional Limitations on Gifting of Funds to Private Enterprise: A Need for Reform*, 20 Seattle U.L.Rev. 199 (1996); Dale F. Rubin, *The Public Pays, the Corporation Profits: The Emasculation of the Public Purpose Doctrine and a Not–for–Profit Solution*, 28 U. Rich. L.Rev. 1311 (1994); Dale F. Rubin, *Constitutional Aid Limitation Provisions and the Public Purpose Doctrine*, 12 St. Louis U. Pub.L.Rev. 143 (1993); *see also Encouragement or promotion of industry not in the nature of public utility, carried on by private enterprise, as public purpose for which tax may be imposed or public money appropriated*, 112 A.L.R. 571 (1938 and supplements).

substantially limited the use of such agreements. Although not applicable to the Agreement at issue here, that statute makes it difficult to discern a strong statutory policy applicable to this Agreement.[17] Second, a statute cannot authorize a violation of the Gift Clause. As our supreme court has stated: "The legislature cannot by legislation destroy the constitutional limits on its authority." *San Carlos Apache Tribe v. Superior Court*, 193 Ariz. 195, 215, ¶ 52, 972 P.2d 179, 199 (1999). Under these circumstances, compliance with A.R.S. § 9–500.11 does not establish compliance with the Gift Clause.

¶ 38 Therefore, we first consider the Appellees' assertion that obtaining the use of parking spaces satisfies the Gift Clause by creating significant, free public parking, including a park and ride facility to encourage the use of public transportation. Appellants concede that the 200 parking spaces set aside for park and ride users are for a valid public purpose. These spaces will be used by passengers of a City sponsored public transit system. We agree that this use qualifies as a valid public purpose, and we find no improper promotion of private interests with respect to those spaces.

¶ 39 Appellants do not seriously dispute that the market rate assumed for purposes of calculating the payments to CityNorth reflects fair value for the 200 spaces, so there appears to be adequate consideration for what the City is paying. Therefore, we conclude that Appellants have failed to meet their burden of proof that the Gift Clause has been violated by the Agreement's provisions for payments relating to the 200 park and ride spaces. Consequently, the City can make payments to CityNorth equal to the value of the 200 spaces set aside for park and ride use. *See* Agreement ¶ 49(b) (providing for reduction in number of City Spaces made

available if City not obligated to pay the full amount specified in the Agreement).

¶ 40 This leaves us with the remaining 2,980 parking spaces that the City asserts it has obtained for free use by the public. The Agreement gives the City the right to use the spaces and to make them available to the public on a nonexclusive basis. Use is limited to passenger vehicles and the City acknowledges that CityNorth's customers may from time-to-time occupy all the spaces. Neither the City nor CityNorth can charge the public for the use of the spaces. The Developer also retains the right to relocate any City space, prohibit overnight use, prohibit vehicles other than passenger vehicles, and permit the use of carpool spaces by the general public except on weekdays from 5 a.m. to 7 p.m.

¶ 41 Looking at the realities of this transaction, we conclude that the payments by the City are not intended to obtain parking spaces for direct use by the City. The City is not seeking parking for its own employees, or for persons doing business with the City. The parking will be used by others engaging in their own private activities. Consequently, the transaction does not fall into the category of ordinary business transactions in which our sole concern is that the value given does not far exceed the value obtained in return. Therefore, we must look beyond the "surface indicia of public purpose." *Wistuber*, 141 Ariz. at 349, 687 P.2d at 357.

¶ 42 Appellees argue that providing free public parking is a direct public purpose, but under these circumstances we cannot agree. Simply asserting that payments are made to obtain "public parking" does not mean the payments serve a public purpose. We must look at who will actually use the parking spaces and for what reasons. In this case, the "public" that will use the spaces are

---

17. We also note that in 2006 the voters of Arizona adopted legislation limiting the use of eminent domain to situations where the property is taken for "public use," and defining "public use" to exclude "the public benefits of economic development, including an increase in tax base, tax revenues, employment or general economic health." A.R.S. § 12–1136(5)(b) (Supp.2008), as adopted by Proposition 207 (November 7, 2006). The constitutional standards regarding eminent domain differ from those applicable to the Gift Clause so this legislation is not directly applicable here, but Proposition 207 shows that there is no consensus regarding the public policy surrounding the use of public resources to encourage economic development or increase the tax base. *See also Bailey v. Myers*, 206 Ariz. 224, 227–31, ¶¶ 10–26, 76 P.3d 898, 901–05 (App. 2003) (explaining factors to consider in defining public use).

actually the private customers of CityNorth, who will be parking their cars so that they can do business with CityNorth's retail tenants. There will be no direct benefit to the City from its payments for parking, yet those payments will plainly "foster or promote the purely private or personal interests" of the customers. We reach the same conclusion if we view the payments as assisting CityNorth's efforts to attract customers or tenants. The payments directly promote CityNorth's private purposes, with only indirect benefits to the City. Under these circumstances, the parking provisions of the Agreement unduly promote private interests and violate the Gift Clause.[18]

¶ 43 Appellees argue, however, that there is no Gift Clause violation because Appellants have conceded that there would be no violation if the City itself owned the parking garage. They argue that the form of ownership of the parking should not matter, so this concession should be controlling. The trial court agreed, concluding that ownership should not be conclusive because the City had the power to lease property under A.R.S. § 9–241 (2008). We disagree. First, the Agreement is not a lease. The City obtains no exclusive rights to the parking spaces and it is apparent that all parties intend the spaces to be used by CityNorth customers.

¶ 44 Moreover, ownership of property by the public is highly significant for Gift Clause purposes. The Gift Clause specifically prohibits a "donation or grant." This language applies to transactions in which the public conveys money or property to someone, not transactions where nothing is transferred. There is no gift of the original purchase price or construction costs if the result is public ownership, because the public body still owns what it paid for. As discussed in *Pilot Properties*, allowing the use of public property without adequate consideration may raise its own Gift Clause issues, but that is a separate question from whether original construction costs constitute a donation or subsidy. Here, unlike *Walled Lake Door Co.*, *Kromko*, or *Pilot Properties*, where the public maintained ownership or control of its property, the City has not purchased or retained an ownership interest or control over any parking structure. It has simply made payments to provide a revenue stream for CityNorth to pay for its parking structures.[19]

¶ 45 We now address the other listed purposes. These purposes are related, so we consider them together. These purposes include promoting economic development, retail uses, employment, an urban core, an increased tax base, and related benefits. We agree that these are laudable goals that the City may pursue. Nevertheless, each is an indirect benefit to the public, not a direct result of the City's payments to CityNorth. Therefore, we must again examine them in more detail than we would an ordinary business transaction in which the City directly obtains something in return for its payments. We begin by reiterating that the City will not own the shopping center, nor will it be used to provide City services. The payments will fund the construction of a venue for private business activities, and the benefits to the public will be filtered through the operation and success of those private activities.[20]

---

**18.** Both the City and CityNorth cite *Bishop v. City of Burlington*, 246 Wis.2d 879, 631 N.W.2d 656 (App.2001), for the proposition that providing parking is a public purpose. We find *Bishop* distinguishable. The case involved a transfer of a parking lot to a merchant as part of a downtown redevelopment plan. The court found the transaction also included the "significant and direct benefit" to the city of a conveyance of a separate piece of property as consideration, and the predominant goal of the transfer was redeveloping a deteriorating section of downtown. Moreover, no constitutional gift clause was at issue; the court applied the more general public purpose doctrine. Because our Gift Clause has its own history and purposes, cases interpreting only the more general public purpose requirement must be relied upon with caution. Finally, even the court in *Bishop* recognized that more than a simple assertion of public purpose is required: "We are mindful that in reviewing the public purpose of a conveyance, the benefits must be direct and not remote and safeguards must be in place to ensure that the benefit is accomplished." *Id.* at 664.

**19.** Public ownership also provides a degree of accountability. Records regarding the revenues and expenses associated with a publicly-owned garage would be available for public inspection and evaluation.

**20.** We recognize that the payments will be made after most of the development is built, so CityNorth will not use the funds to pay for construc-

¶ 46 As previously discussed, the Gift Clause was intended to "protect against the 'extravagant dissipation of public funds' by government in subsidizing private enterprises such as railroad and canal building in the guise of 'public interest.'" *Kotterman,* 193 Ariz. at 288, ¶ 52, 972 P.2d at 621. No doubt the public officials who sought to spend public funds to ensure the construction of railroads and similar developments also were sincerely motivated by goals such as promoting economic development and enhancing the tax base. Here, Appellees make the same arguments to justify providing $97.4 million of public funds to a private party to build a shopping center. Under these circumstances, we think these payments are exactly what the Gift Clause was intended to prohibit. To find that the Agreement in this case satisfies the Gift Clause would be the equivalent of finding that subsidizing railroads and canals for the purpose of economic development was constitutional. Considering the well-established purposes of the Gift Clause, we cannot read it so broadly.

¶ 47 Appellees implicitly argue that the public benefits flowing from the Agreement are so substantial that we should assume the Gift Clause is satisfied. We reject such an assumption. Just as *Wistuber* held that consideration cannot be assumed from a public purpose, we conclude that compliance with the Gift Clause cannot be assumed because the indirect public benefits may be substantial. Promoting economic development, increased employment, an urban core, and an enhanced tax base are legitimate purposes for the City to pursue, but we must also examine the means by which the City seeks to further those purposes. Even if the potential benefits are great, they are not sufficient to overcome the prohibition in the Gift Clause against donations or subsidies to private persons.

¶ 48 As a final point regarding the Gift Clause, we recognize that the City has structured the Agreement in a way that prevents it from losing money. Its payment obligations are contingent on the project being built and generating tax revenue, and cannot exceed fifty percent of what the City receives. We see parallels between this arrangement and cases in which revenue bonds were challenged as violating the debt limitations of our constitution. As we discussed in *Long v. Napolitano,* 203 Ariz. 247, 260–66, 53 P.3d 172, 185–91 (App.2002), the Arizona Constitution significantly limits the state from incurring debts that become general obligations of the government. Nevertheless, obligations may be incurred if the source of funds for repayment is limited to a special fund, which may include taxes directly related to the project funded by the debt. *Id.* at 264, ¶¶ 62–65, 53 P.3d at 189. In this case, the City has essentially created a special fund from the tax revenues derived from the project, and the payments to CityNorth may only be made from that fund.

¶ 49 If the purposes of the debt limitations and the Gift Clause were the same, we might be persuaded that this structure satisfies the Gift Clause, just as the special fund structure serves to satisfy the debt limitation. The arrangement plainly addresses the purpose of the Gift Clause relating to preventing the depletion of the public treasury or inflation of the public debt. *Kromko,* 149 Ariz. at 320, 718 P.2d at 479. As we read the Agreement, neither of these results can happen because the payments are limited to fifty percent of receipts and will not begin until the shopping center is operational.

¶ 50 Nevertheless, as we have discussed, the Gift Clause requires that we also examine whether any "private or personal interests of any individual" are served by a transaction. *Id.* at 321, 718 P.2d at 480. This analysis ensures that "[p]ublic funds are to be expended only for 'public purposes' and cannot be used to foster or promote the purely private or personal interests of any individual." *Id.* This purpose is not met merely because the City's payments are limited to half of the amount it collects. We must also consider how the funds are used. As discussed above, the funds go directly to CityNorth for private purposes. The Agree-

tion. Nevertheless, because it is clear that the payments under the Agreement are intended to fund the construction of part of the development,

we do not find the timing of the payments to be controlling.

472

ment is well-structured to prevent a loss to the City. Nevertheless, it does not satisfy the Gift Clause merely because there cannot be such a loss.[21]

¶ 51 In summary, we conclude that the Agreement violates the Gift Clause of the Arizona Constitution, except insofar as it provides for payments in exchange for park and ride parking spaces. We affirm the trial court's judgment that the Agreement is valid with respect to the park and ride spaces, reverse the judgment finding the payments under the Agreement to be valid in all other respects, and remand to the trial court to enter judgment for the Appellants.

¶ 52 The City requests attorneys' fees under A.R.S. § 12–341.01 (2003). The City is not the prevailing party, so we deny its request. Appellants request attorneys' fees pursuant to A.R.S. § 12–348 (2003) and the private attorney general doctrine. None of the subsections of § 12–348 appear to apply to an action against a city under these circumstances, so we deny fees under that statute. In the exercise of our discretion, we grant Appellants reasonable attorneys' fees under the private attorney general doctrine, and their costs under A.R.S. § 12–341 (2003), upon their compliance with the procedures outlined in Rule 21, Ariz.R.Civ.App.P.

## CONCLUSION

¶ 53 We affirm the judgment in part, reverse it in part, and remand to the trial court for further actions consistent with this opinion.

CONCURRING: LAWRENCE F. WINTHROP, Presiding Judge and PHILIP HALL, Judge.

21. Because our decision is based on who receives the funds and what they are used for, we in no way address tax incentives that may directly serve a public purpose. *See e.g.*, A.R.S. § 42–6010(D)(3), (4), (5), (6) (defining tax incentives for redevelopment, reimbursement for public infrastructure, preserving historical buildings, and environmental cleanup).