515 P.2d 355

Lee HEINER, William Stuart Wunch, Zane W. Merkley, Bruce Jay Hancock, W. Vaughn Ellsworth, James G. Papik and Dr. Philip F. Hartman, Appellants,

v.

The CITY OF MESA, Jack J. Taylor, Wayne G. Pomeroy, Eldon Cooley, Bert Freestone, William G. Wright, Lee Roy Kellis, George Bliss and J. W. Petrie, Southside District Hospital, Good Samaritan Hospital, W. D. Pew, Raymond L. Russell, Arthur L. Livingston, Manuel Matta, H. Richard Poyntner, Richard E. Skousen, Scott Parker and Clara B. Emmett, Appellees.

No. I CA–CIV 2047.

Court of Appeals of Arizona, Division 1, Department A.

Nov. 1, 1973.

Rehearing Denied Dec. 12, 1973.

Review Denied Jan. 15, 1974.

Tanner, Jarvis, Owens & Hoyt by Wallace O. Tanner, Phoenix, for appellants.

J. LaMar Shelley, Mesa, for appellees City of Mesa, its Mayor, Councilmen and City Manager.

Killian & Legg, by John G. Hough, Mesa, for appellees Good Samaritan Hospital and Southside Dist. Hospital, the members of its Bd. of Trustees and its Manager.

## OPINION

STEVENS, Judge.

The appellants were the plaintiffs in the trial court. The appellees were the defendants. The trial court rendered a summary judgment in favor of the defendants and the plaintiffs have appealed therefrom.

While there are other issues which will be discussed, the main issue involves the application of § 7 of Article 9 A.R.S. of our Constitution which reads as follows:

"§ 7. Gift or loan of credit; subsidies; stock ownership; joint ownership

Section 7. Neither the State, nor any county, city, town, municipality, or other subdivision of the State shall ever give or loan its credit in the aid of, or make any donation or grant, by subsidy or otherwise, to any individual, association, or corporation, or become a subscriber to, or a shareholder in, any company or corporation, or become a joint owner with any person, company, or corporation, except as to such ownerships as may accrue to the State by operation or provision of law."

## DEPOSITIONS

There is an interesting procedural matter which will be discussed first.

There were two depositions of the defendant Scott Parker. There were 33 exhibits marked in connection with the first deposition. The trial court's judgment recites that the court took depositions into consideration. There were two separate designations of records on appeal. One called for the two Parker depositions and one called for the 33 exhibits. When the records reached this Court the depositions were not among the papers so received nor were there papers that could be readily identified as the 33 exhibits.

After inquiry by this Court, it was determined that the depositions were used by the trial court in reaching its conclusion on the motion for summary judgment but that the depositions had not been filed of record in the Superior Court. Unfortunately, this is a situation that this Court has observed more than once. This Court honored a stipulation to enlarge the record to include the depositions. There were no exhibits attached to either deposition. An examination of the first deposition disclosed that at the conclusion of the taking thereof all of the exhibits were surrendered into the possession of the attorney for the plaintiffs for his study. The exhibits were then returned to the defendant who produced them and they were to be available at the trial of the case.

Copies of two of the deposition exhibits were attached to the plaintiffs' original complaint. Seven of the deposition exhib-

its were produced in support of the defendants' motion for summary judgment and in the Superior Court file they were marked with numbers which correspond with the numbers assigned to them at the time of the taking of the deposition. Thus, it appears that the trial court and this Court have the advantage of the depositions and of those exhibits which both sides of the controversy felt were material to the motions for summary judgment.

It should also be noted that in addition to the granting of the defendants' motion for summary judgment the trial court denied the plaintiffs' motion for a partial summary judgment.

## BACKGROUND

A portion of the background of this controversy is recorded in the case of South Side District Hospital v. Hartman, 62 Ariz. 67, 153 P.2d 537 (1944), which case will hereinafter be referred to as the Hartman case. In the Hartman case, the appellee is the same doctor of osteopathy who is an appellant in the case at bar.

In 1923 the City of Mesa acquired 10.9 acres of land on which were some improvements. This land and the physical improvements thereon will be referred to as the property in question [PIQ]. Shortly after acquiring the PIQ, Mesa leased [1] the same to Southside District Hospital [Southside], the appellant in the Hartman case and one of the appellees now before this Court.

Although the word District appears in the name of Southside, it is not a hospital district within the contemplation of A.R.S. §§ 36-1231 to 1248. The word "District" refers to a geographical area that Southside was formed to serve. This area includes the Cities of Mesa, Tempe, Chandler, Gilbert and Lehi, together with the surrounding community. Southside at all times has been a non-profit corporation formed to operate, and operating as its sole function, the hospital rendering services to the people of the area it was intended to serve.

After the 1923 lease there was a series of similar leases, one of which was upheld by our Supreme Court in the Hartman case. One of the considerations which entered into the Supreme Court's decision upholding the lease was the 1942 enactment of a statute which is now A.R.S. § 9-242.[2]

One of the features of the leases, a feature considered in the Hartman case, was the privilege of Southside to accumulate a reserve fund. See 62 Ariz. at 73, 153 P.2d at 539. This fund could be used for capital improvements of the structures, which improvements became the property of Mesa. The fund could also be used for the purchase of hospital equipment, which became the property of Southside. The trial court in the Hartman case held that the income derived from the operation of the hospital was the property of the City of Mesa. This holding was vacated by the Supreme Court by its reversal of the trial court.

Following the 1944 decision in the Hartman case, the arrangement continued. The PIQ was improved by the use of reserve funds, by the use of gifts, and by federal grants. One of the series of leases was a 15-year lease which was entered into on 30 October 1956. [Exhibit B to the Complaint being Deposition Exhibit 5].[3]

---

1. A copy of this first lease is designated as deposition Exhibit 3 and is a part of the record in support of the defendants' motion for summary judgment.

2. § 9-242. Hospitals
   A. The corporation may own, operate and control hospitals in the interest of the general welfare.
   B. The council may lease a hospital to a nonprofit association or corporation organized under state law, on such terms and conditions, and for such consideration, as the council may prescribe.

3. NOTE: Numbered exhibits herein referred to are the exhibits which the defendants furnished the trial court in support of their motion for summary judgment. They bear the Parker deposition numbers.

Late in 1964 the Board of Trustees of Southside decided to secure a survey of the hospital and the community needs. [Exhibit 12] A report, known as the Hamilton Report, was received in December 1965. [Exhibit 13] Without a detailed recitation of the contents of the report, the report found the existing hospital facilities to be inadequate, and found that the land area contained in the PIQ was inadequate for expansion. The report urged the acquisition of more land and the construction of a new hospital building.

In 1967 the State Health Department declared that 121 of the 146 beds of Southside were substandard.

As of a date which is not clear to this Court, legislation was prepared and introduced into the Arizona Legislature. Apparently the purpose of the proposed legislation was to enlarge the powers afforded by A.R.S. § 9–242 to include the right to operate an extended care facility. This Court is indefinite in these statements in that the proposed legislation, while an exhibit to the Parker deposition, was not furnished to the trial court and thus not furnished to this Court. The proposed legislation did not pass.

The Southside Board of Trustees and the City of Mesa explored other ways of attempting to finance a new modern hospital to continue this vital community service. In the Hartman case the Supreme Court characterized the efforts to furnish hospital services as a,

"* * * very praiseworthy and laudable object sought by the City of Mesa to be accomplished ·for the benefit of that community, we think the law [the 1942 statute] should be sustained unless there is some very plain provision in the constitution against it." 62 Ariz. at 72, 153 P.2d at 539.

An election in the area served by Southside was held in September 1967. The overall vote was against creating a district as a legal entity with bonding authority for the purpose of acquiring more land and building a new hospital.

Other means of reaching the objective of a new and modern hospital were found to be not feasible.

Negotiations were undertaken between Southside and the Good Samaritan Hospital, one of the defendants-appellants before this Court. Good Samaritan is also a non-profit corporation and has operated a general hospital in the Phoenix area for many years. Mesa through its officials was fully aware of all of these proceedings.

Negotiations came to a head on 13 February 1968. On that date Southside and Good Samaritan issued a joint statement of their intent to merge. [Part of Exhibit 2]. Mesa and Southside entered into an agreement [Exhibit A to the Complaint being Deposition Exhibit 7], wherein it was recognized that the reserve fund was approximately one million dollars and that the general public would be best served by a new hospital. It was agreed that Southside would undertake to build and operate a new hospital of equal or greater capacity, meeting all of the necessary hospital standards, that Mesa relinquished all claim, if any it had, to the ·reserve fund, and subject to final court approval, Mesa agreed to deed the PIQ to Southside.

The present litigation was commenced on 12 June 1968.

On 2 August 1968 the Southside-Good Samaritan merger agreement was executed. [Exhibit 1]. Southside was absorbed by Good Samaritan. Some of the members of the Southside Board of Trustees became members of the Board of Good Samaritan. The funds and accounts of Southside were maintained in a separate bank account.

On 14 August 1968 a sum in excess of $300,000.00 was drawn from the reserve funds and used to pay the full purchase price of 60 acres of land to be utilized by the new hospital. Title was taken in the name of Good Samaritan. This land was augmented by a gift of an adjoining 22 acres of land. At the time of the second Parker deposition plans were on their way for a new 275-bed hospital. The unused reserve funds were to be used in the devel-

opment plans and in the initial construction of the new hospital. The ultimate disposition of the PIQ had not then been decided. The value of the PIQ, and its improvements together with the hospital equipment, had increased from the $100,000.00 referred to in the Hartman case. [62 Ariz. at 68, 153 P.2d at 537], to well over a million dollars.

## RESERVE FUNDS

■ Considering the holding necessarily implied in the Hartman case and from our own review of the lease agreements, we hold that the reserve funds were the property of Southside and were not the property of Mesa. The City of Mesa has the power to see that the funds were disbursed only for the purposes covered by the lease or approved by the Mesa City Council. We hold that only the City Council had the authority to question or veto expenditures from the reserve fund. This is in conformity with the very broad powers authorized by A.R.S. § 9–242.

■ The plaintiffs urge that the expenditure of $9,500.00 of reserve funds for the Hamilton report was not proper. We disagree. Not only did Mesa approve of the use of these funds for this purpose, but it was only sound business practice on the part of Southside to secure expert advice as to the best road to follow in the future in attempting to carry out its mission.

Even had the reserve funds been the property of Mesa and thus public funds, which we hold they are not, the case of City of Glendale v. White, 67 Ariz. 231, 194 P.2d 435 (1948), which approved the use of public funds for the payment of dues to the Arizona Municipal League for the education of the governing body of the City, is authority for expenditures to secure expert advice similar to the Hamilton report.

The plaintiffs urge that the expenditure of over $18,000.00 for the preparation of the proposed legislation and the efforts to secure its passage is a wrongful expenditure of public funds. Again we state that

the reserve funds were not public funds. Again the use thereof is subject to review only by the City of Mesa which did not express disapproval.

The plaintiffs urge that the expenditure of reserve funds in a sum in excess of $14,000.00 to support the election of September 1967 in an effort to create a hospital district with the power to issue bonds was an illegal expenditure. Had these funds been public funds, the case of Sims v. Moeur, 41 Ariz. 486, 19 P.2d 679 (1933), would have been applicable. Section 18 of Article 14 of the Arizona Constitution is as follows:

"§ 18. Contributions to influence elections or official action

Section 18. It shall be unlawful for any corporation, organized or doing business in this State, to make any contribution of money or anything of value for the purpose of influencing any election or official action."

We again rely upon the fact that the reserve funds were not public funds, that the expenditure was in the interest of serving a public need which was recognized in the Hartman case and the fact that only the City of Mesa was in a position to question this expenditure.

■ In support of the plaintiffs' motion for partial summary judgment, they submitted the affidavit of B. F. McGough, a long-time member of that Board of Trustees of Good Samaritan, the secretary of the Board for a number of years and who at the time of this affidavit was an honorary member of the Board. The McGough affidavit contains the following statement:

"Samaritan used $1,000,000.00 from the reserve fund accumulated by Southside District Hospital under its lease with the City of Mesa to buy the Maryvale Hospital in Phoenix."

There is no showing that the affidavit was made on his "personal knowledge", his affidavit did not "set forth such facts as would be admissible in evidence" and did not "show affirmatively that the affiant is

competent to testify to the matters stated therein." Rule 56(e), Rules of Civil Procedure, 16 A.R.S. The McGough affidavit did not create a factual issue contrary to the Parker deposition and the records produced at that deposition in support of his testimony that over $300,000.00 had been used to buy land for the new hospital and that the balance of the reserved funds was in a separate Southside account to be used in the development plans and initial construction of the new hospital.

We hold that the plaintiffs are in no position to question the validity of the expenditures from the reserve fund.

## THE REAL PROPERTY

■ The crucial question arises out of the agreement by Mesa to deed the 10.9 acres of land and the improvements thereon to Southside to become the property of Good Samaritan under the merger agreement, and whether this is in violation of § 7, Art. 9 of the Arizona Constitution quoted earlier in this opinion. There was no cash consideration recited. The agreement recited the recommendations of the Hamilton report, that the best interest of Mesa, of Southside and of the general public would be better served with a new hospital facility and,

"* * * the City has determined that it will be in the best interest of the City and the general public if the Hospital acquires title to the above described property, with the improvements thereon, together with the right to use the existing building reserve funds for purchase of a new site and construction of a new hospital on condition that the Hospital agrees that it will cause to be constructed, within the limits of the City of Mesa, and thereafter to be maintained by said Hospital therein, a first class hospital facility with a total capacity of not less than 146 beds conforming to the requirements of the United States Department of Public Health; * * *."

In relation to the general statutory law concerning the right of municipalities to divest themselves of the title of real property we quote:

"§ 9–241. Purchase and sale of property

A. The corporation may purchase, receive, hold, lease and convey property, real and personal, necessary or proper to carry out the purposes of the corporation, within or without its limits.

B. Every conveyance of real property to the corporation shall be in its corporate name. Conveyances by the corporation shall be executed by the mayor with the advice and consent of the council, at a regular meeting thereof.

C. Real property of the corporation shall be sold as provided by § 9–402."

"§ 9–402. Sale and disposition of property; advertising for bids; publication

A. A city or town may sell and convey all or any part of its real or personal property, whether or not the property is devoted exclusively to public use.

B. The sale shall not be made until invitation for bids for the purchase of the property has been published as provided by § 39–204, and notice has been posted in three or more public places within the city or town."

On the other hand, § 1.01(b) of the Charter of the City of Mesa grants to the City the power:

"To lease, sell, convey and otherwise dispose of real or personal property owned by the City in the manner and upon conditions determined by the Council."

These Charter provisions control over the above-quoted statutory provisions. City of Tucson v. Arizona Alpha of Sigma Alpha Epsilon, 67 Ariz. 330, 195 P.2d 562 (1948). In those instances where sales can only be made to the highest and best bidder, such provisions are upheld. Illustrative cases are: Osborne v. Mitten, 39 Ariz. 372, 6 P. 2d 902 (1932); Prescott Community Hospital v. Prescott School District, 57 Ariz. 492, 115 P.2d 160 (1941); Brown v. City of Phoenix, 77 Ariz. 368, 272 P.2d 358 (1954), and Sulphur Springs v. City of

Tombstone, 99 Ariz. 110, 407 P.2d 76 (1965). There is no such restriction in relation to sales of real property by the City of Mesa.

The public good and general welfare are vital factors. Leatherwood v. Hill, 10 Ariz. 243, 89 P. 521 (1906); Humphrey v. City of Phoenix, 55 Ariz. 374, 102 P.2d 82 (1940); the Hartman case, supra; and City of Phoenix v. Superior Court, 65 Ariz. 139, 175 P.2d 811 (1946).

The Hartman case and A.R.S. § 9–242 recognize the public good and the general welfare in the establishment of and operation of hospital facilities. The broad discretion granted by the City Charter of the City of Mesa controls over the limitations imposed by A.R.S. §§ 9–241 and 9–402. The public benefit removes the contemplated deed from the restrictions of § 7 of Article 9 of the Constitution and constitutes a valid and valuable consideration under the circumstances presented to us in this case. There is here nothing to establish bad faith or fraud on the part of the City of Mesa, Southside or Good Samaritan.

We have read the numerous cases which have been cited to us from other jurisdictions and we believe that the Arizona case law is adequate for the determination of this cause.

Under all the circumstances, we hold that the trial court did not err in rendering the summary judgment here in question and the judgment is affirmed.

DONOFRIO, P. J., and OGG, J., concur.