SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| MEYER TURKEN; KENNETH D. CHEUVRONT; JAMES IANNUZO; JUSTIN SHAFER; ZUL GILLANI; and KATHY ROWE, | ) ) ) ) ) | Arizona Supreme Court No. CV-09-0042-PR |

MEYER TURKEN; KENNETH D.                )   Arizona Supreme Court
CHEUVRONT; JAMES IANNUZO; JUSTIN        )   No. CV-09-0042-PR
SHAFER; ZUL GILLANI; and KATHY          )
ROWE,                                    )   Court of Appeals
                                         )   Division One
          Plaintiffs/Appellants/ )   No. 1 CA-CV 08-0310
                Cross-Appellees, )
  v.                                     )   Maricopa County
                                         )   Superior Court
PHIL GORDON, in his official            )   No. CV2007-013766
capacity as Mayor of the City of        )
Phoenix; DAVE SIEBERT, in his           )
official capacity as member of          )
the Phoenix City Council and            )   **O P I N I O N**
Vice Mayor; PEGGY NEELY, in her         )
official capacity as member of          )
the Phoenix City Council; PEGGY         )
BILSTEN, in her official                )
capacity as member of the               )
Phoenix City Council; TOM               )
SIMPLOT, in his official                )
capacity as member of the               )
Phoenix City Council; CLAUDE            )
MATTOX, in his official capacity        )
as member of the Phoenix City           )
Council; GREG STANTON, in his           )
official capacity as member of          )
the Phoenix City Council;               )
MICHAEL JOHNSON, in his official        )
capacity as member of the               )
Phoenix City Council; FRANK             )
FAIRBANKS, in his official              )
capacity as City Manager of the         )
City of Phoenix; and CITY OF            )
PHOENIX,                                 )
                                         )
          Defendants/Appellees, )
and                                      )
                                         )
NPP CITYNORTH, L.L.C.,                   )
                                         )
   Intervenor/Defendant-Appellee/ )
                Cross-Appellant. )
_____)

Appeal from the Superior Court in Maricopa County
The Honorable Robert E. Miles, Judge

**AFFIRMED IN PART**

_____

Opinion of the Court of Appeals, Division One
220 Ariz. 456, 207 P.3d 709 (App. 2008)

**VACATED AND REMANDED**

_____

SCHARF-NORTON CENTER FOR CONSTITUTIONAL LITIGATION          Phoenix
    By   Carrie Ann Sitren
        Clint Bolick
Attorneys for Meyer Turken, Kenneth D. Cheuvront,
James Iannuzo, Justin Shafer, Zul Gillani, and Kathy Rowe

FENNEMORE CRAIG, P.C.                                       Phoenix
    By   Timothy Berg
        Andrew M. Federhar
        Theresa Dwyer-Federhar
        Scott J. Shelley

And

GARY VERBURG, PHOENIX CITY ATTORNEY                         Phoenix
    By   Gary Verburg, City Attorney
Attorneys for Phil Gordon, Dave Siebert, Peggy Neely, Peggy
Bilsten, Tom Simplot, Claude Mattox, Greg Stanton, Michael
Johnson, Frank Fairbanks, and City of Phoenix

GAMMAGE & BURNHAM, P.L.C.                                   Phoenix
    By   Lisa T. Hauser
        Grady Gammage, Jr.
        Cameron C. Artigue
        Heather J. Boysel
Attorneys for NNP CityNorth, L.L.C.

SHERMAN & HOWARD, L.L.C.                                    Phoenix
    By   Gregory W. Falls
Attorneys for Amicus Curiae National Federation of Independent
Business Small Business Legal Center

```
MARISCAL, WEEKS, MCINTYRE & FRIEDLANDER, P.A.          Phoenix
     By   Gary L. Birnbaum
          Scot L. Claus
Attorneys for Amicus Curiae Valley Partnership


DAVID R. MERKEL                                         Tempe
     By   David R. Merkel
Attorney for Amicus Curiae League of Arizona Cities and Towns


TERRY GODDARD, ARIZONA ATTORNEY GENERAL               Phoenix
     By   Rex C. Nowlan, Acting Section Chief
          Charles A. Grube, Senior Agency Counsel
Attorneys for Amicus Curiae Kent Ennis


GLENN J. GIMBUT, CITY ATTORNEY                        San Luis
     By   Glenn J. Gimbut, City Attorney
Attorney for Amicus Curiae City of San Luis


BARBARA LAWALL, PIMA COUNTY ATTORNEY                   Tucson
     By   Regina L. Nassen, Deputy Pima County Attorney
Attorneys for Amicus Curiae Pima County Board of Supervisors


KIELSKY, RIKE & ELGART, PLLC                            Mesa
     By   Michael Kielsky
          Christopher Rike
Attorneys for Amici Curiae Arizona Chapter of Americans
for Prosperity, Arizona Free Enterprise Club, Valley
Business Owners (and Concerned Citizens), Inc.,
and Art Segal


ARIZONA CENTER FOR LAW IN THE PUBLIC INTEREST         Phoenix
     By   Timothy M. Hogan
          Joy E. Herr-Cardillo
Attorneys for Amicus Curiae Arizona Center for Law
in the Public Interest


CRAIG D. TINDALL, GLENDALE CITY ATTORNEY              Glendale
     By   Craig D. Tindall, City Attorney
          Paul M. Li, Assistant City Attorney
          Christina A. Parry, Assistant City Attorney
Attorneys for Amicus Curiae City of Glendale


DEBORAH W. ROBBERSON, SCOTTSDALE CITY ATTORNEY       Scottsdale
     By   Robert B. Washburn, Deputy City Attorney


And
```

TOWN OF ORO VALLEY                                         Oro Valley
     By   Tobin Rosen, Town Attorney
Attorneys for Amici Curiae City of Scottsdale and
Town of Oro Valley

_____

**H U R W I T Z**, Vice Chief Justice

¶1        The issue for decision is whether an agreement by the City of Phoenix to pay a developer as much as $97.4 million for the use of garage parking spaces violates the Gift Clause, Ariz. Const. art. 9, § 7.  Although we conclude that the agreement quite likely violates the Gift Clause, because language in our previous opinions could well have led the City to conclude that the agreement was constitutional, we today clarify our Gift Clause jurisprudence and apply our decision prospectively only.

**I.**

**A.**

¶2        CityNorth is the proposed commercial core of Desert Ridge, a Phoenix master-planned community.  CityNorth is projected to contain office space, luxury hotels, residences, several parking garages, and more than one million square feet of high-end retail space.

¶3        CityNorth's developer, NPP CityNorth L.L.C. ("NPP"), approached the City of Phoenix, claiming it could not complete the project as planned without financial assistance.  The City became concerned that absent such aid, the development might not

4

contain the full proposed retail component and potential sales tax revenues would be lost, perhaps to neighboring Scottsdale.

¶4 In response to NPP's request, the City Council adopted Ordinance No. S-33743, which authorized the City to enter into a "Parking Space Development and Use Agreement" (the "Parking Agreement") with NPP. The Ordinance contained findings, as required by A.R.S. § 9-500.11(D) (2008), that tax revenue generated by the CityNorth project would exceed the amount to be paid to NPP under the Agreement and that without a tax incentive, the project would not locate in the City in the same time, place, or manner. The Ordinance provided, as required by § 9-500.11(H), that the City not enter into the Parking Agreement until these findings were independently verified.

¶5 After a consultant verified the findings, the City and NPP executed the Parking Agreement. The Agreement required NPP to set aside, for 45 years, 2,980 parking garage spaces for the non-exclusive use of the general public and 200 spaces for the exclusive use of drivers participating in commuting programs. Payments by the City to NPP were conditioned on the construction of both the garage spaces and at least 1.02 million square feet of retail space. The City was thereafter obligated to make annual payments to NPP equal to half of certain privilege taxes

5

generated at the development, up to $97.4 million, for a period up to eleven years and three months.[1]

**B.**

¶6    In August 2007, Meyer Turken and several other Phoenix taxpayers and business owners (collectively, "Turken") sued the City to enjoin payments to NPP under the Parking Agreement. Turken alleged that the Agreement violated the Gift Clause, which provides:

> Neither the state, nor any county, city, town, municipality, or other subdivision of the state shall ever give or loan its credit in the aid of, or make any donation or grant, by subsidy or otherwise, to any individual, association, or corporation, or become a subscriber to, or a shareholder in, any company or corporation, or become a joint owner with any person, company, or corporation . . . .

Ariz. Const. art. 9, § 7.   Turken also alleged that the Parking Agreement violated the Equal Privileges and Immunities Clause, Ariz. Const. art. 2, § 13, and the Special Laws Clause, Ariz. Const. art. 4, pt. 2, § 19.

¶7    The superior court granted summary judgment to the defendants.   In rejecting Turken's Gift Clause arguments, the

---

[1]    The taxes specified in the Parking Agreement are "construction transaction privilege taxes" and taxes "directly related to the business activities of amusement, commercial property rental, hotels and motels, job printing, publishing, rental of tangible personal property, residential property rental, restaurants and bars, retail sales, and use taxes."

court relied upon the two-pronged test set forth in *Wistuber v. Paradise Valley Unified School District*, 141 Ariz. 346, 687 P.2d 354 (1984). *Wistuber* provides that a governmental expenditure does not violate the Gift Clause if (1) it has a public purpose, and (2) in return for its expenditure, the governmental entity receives consideration that "is not so inequitable and unreasonable that it amounts to an abuse of discretion, thus providing a subsidy to the private entity." *Id.* at 349, 687 P.2d at 357 (internal quotations and citations omitted). The superior court found that payments to NPP would serve a public purpose and counted the anticipated increase in tax revenues from the CityNorth development as part of the relevant consideration.

¶8 The court of appeals reversed. *Turken v. Gordon*, 220 Ariz. 456, 207 P.3d 709 (App. 2008). That court read *Kromko v. Arizona Board of Regents*, 149 Ariz. 319, 718 P.2d 478 (1986), as engrafting a third requirement onto the *Wistuber* test: Under "the realities of the transaction," the challenged governmental expenditure must not "unduly promot[e] private interests." *Turken*, 220 Ariz. at 467 ¶ 33, 207 P.3d at 720. The court of appeals identified six questions as pertinent to that inquiry, *id.* at 467-68 ¶ 33, 207 P.3d at 720-21, and concluded that

7

payments for the 2,980 parking spaces not reserved for commuters violated the Gift Clause, *id.* at 472 ¶ 51, 207 P.2d at 725.[2]

¶9       The City and NPP petitioned for review.  We granted review because interpretation of the Gift Clause is an issue of statewide importance.  We have jurisdiction under Article 6, Section 5, Clause 3, of the Arizona Constitution and A.R.S. § 12-120.24 (2003).

## II.

### A.

¶10       The records of Arizona's constitutional convention provide little guidance in interpreting the Gift Clause.  *See* John S. Goff, *The Records of the Arizona Constitutional Convention of 1910*, at 483 (1990) (mentioning the Gift Clause only to note a minor grammatical correction).  Because our Gift Clause was taken nearly verbatim from Montana's constitution, our early cases looked to that state's decisions.  In one such case, this Court noted:

> [The Gift Clause] represents the reaction of public opinion to the orgies of extravagant dissipation of public funds by counties, townships, cities, and towns in aid of the construction of railways, canals, and other like undertakings during the half century preceding 1880, and it was designed primarily to prevent the use of public funds raised by general

---

[2]   The court of appeals did not reach Turken's other constitutional arguments.  *Turken*, 220 Ariz. at 461 ¶ 9 n.1, 207 P.3d at 714 n.1.

8

> taxation in aid of enterprises apparently devoted to quasi public purposes, but actually engaged in private business.

*Day v. Buckeye Water Conservation & Drainage Dist.*, 28 Ariz. 466, 473, 237 P. 636, 638 (1925) (quoting *Thaanum v. Bynum Irrigation Dist.*, 232 P. 528, 530 (Mont. 1925)).

¶11      Early Gift Clause challenges often also attacked public expenditures under Article 9, Section 1 of the Arizona Constitution (the "Tax Clause"), which requires that "all taxes . . . shall be levied and collected for public purposes only." *See, e.g.*, *Proctor v. Hunt*, 43 Ariz. 198, 201, 29 P.2d 1058, 1059 (1934) ("It is, of course, axiomatic that money raised by public taxation is to be collected for public purposes only, and can only legally be spent for such purposes and not for the private or personal benefit of any individual.") (citing both the Gift Clause and the Tax Clause).  Although the Gift Clause does not itself mention public purpose, the public purpose requirement has long been a fixture of our Gift Clause jurisprudence, perhaps because Gift Clause challenges typically involve the expenditure of tax funds.  *See City of Glendale v. White*, 67 Ariz. 231, 238, 194 P.2d 435, 440 (1948), *overruling City of Phoenix v. Michael*, 61 Ariz. 238, 148 P.2d 353 (1944).

¶12      Our cases interpreting the Gift and Tax Clauses have struggled to define "public purpose."  In a seminal Tax Clause case, we noted that "[p]ublic purpose is a phrase perhaps

9

incapable of definition, and better elucidated by examples." *City of Tombstone v. Macia*, 30 Ariz. 218, 222, 245 P. 677, 679 (1926). This language is approvingly cited in subsequent Gift Clause cases. *See, e.g.*, *White*, 67 Ariz. at 236, 194 P.2d at 438-39; *Maricopa County v. State,* 187 Ariz. 275, 280, 928 P.2d 699, 704 (App. 1996).

¶13 Our Gift Clause jurisprudence has also emphasized that "the term 'public purpose' . . . changes to meet new developments and conditions of times." *White*, 67 Ariz. at 236, 194 P.2d at 438. Our cases therefore find public purposes in many contexts that might not have been familiar to our Constitution's framers. For example, in rejecting a challenge to expenditures for a slum clearance program, we noted that

> [i]f it be borne in mind that slum clearance projects are means adopted by society for self-protection against crime and disease, and that money spent to prevent or eradicate these enemies is for the public good and general welfare, even though the effect is felt by a given class more than by the community at large, it will be realized the sums spent are not a gift or loan to anyone but an expenditure in the interests of the general public.

*Humphrey v. City of Phoenix*, 55 Ariz. 374, 387, 102 P.2d 82, 87 (1940); *accord City of Phoenix v. Superior Court of Maricopa County*, 65 Ariz. 139, 146, 175 P.2d 811, 815 (1946) (citing *Humphrey* in upholding a program to build temporary housing for military veterans). Subsequent cases have taken a similarly expansive view of public purpose. *E.g.*, *Indus. Dev. Auth. of*

10

*Pinal County v. Nelson*, 109 Ariz. 368, 509 P.2d 705 (1973) (rejecting Gift Clause attack on issuance of industrial development bonds by public agency); *Town of Gila Bend v. Walled Lake Door Co.*, 107 Ariz. 545, 490 P.2d 551 (1971) (finding public purpose in constructing water line serving only one factory).

¶14     Our cases also emphasize that although determining whether governmental expenditures serve a public purpose is ultimately the province of the judiciary, courts owe significant deference to the judgments of elected officials.  For example, we noted in *White* that the city council "should have some latitude" in determining whether membership in the Arizona Municipal League would provide public benefit.  67 Ariz. at 237, 194 P.2d at 439.  *Wistuber* likewise stated that "courts must not be overly technical and must give appropriate deference to the findings of the governmental body."  141 Ariz. at 349, 687 P.2d at 357.

**B.**

¶15     Montana courts had concluded by the early 1970's that a public purpose alone satisfied their Gift Clause.  *See, e.g.*, *Fickes v. Missoula County*, 470 P.2d 287, 291 (Mont. 1970).  In 1973, a panel of our court of appeals took the same position.  *Heiner v. City of Mesa*, 21 Ariz. App. 58, 64, 515 P.2d 355, 361 (1973).

11

¶16 This approach, however, threatened to reduce the Gift Clause to something of a redundancy, because the Tax Clause proscribes use of tax revenues for anything but a public purpose.[3] Moreover, reliance on public purpose alone left open the possibility that government payments made under a contract, even if for a public purpose, might so greatly exceed the consideration received in return as to amount to a subsidy to a private entity. For example, a city's purchase of a garbage truck would undoubtedly serve a public purpose. Purchasing the truck for twenty times its fair value, however, would constitute a subsidy to the seller.

¶17 A second panel of the court of appeals rejected the *Heiner* approach in *City of Tempe v. Pilot Properties, Inc.*, 22 Ariz. App. 356, 527 P.2d 515 (1974). *Pilot Properties* held that in evaluating whether a contract between a municipality and private party violates the Gift Clause, a court must find not only a public purpose, but also assess whether "the consideration received by the city . . . is so inequitable and

---

[3] Because the Montana courts had construed that state's gift clause to permit any expenditures made for a public purpose, the framers of the revised Montana Constitution omitted the clause as unnecessary in light of other constitutional provisions limiting public expenditures to public purposes. Montana Legislature, *Montana Constitutional Convention 1971-1972*, at 583 (1979), *available at* http://montanacourts.org/content/library/mt_cons_convention/vol2.pdf.

unreasonable that it amounts to an abuse of discretion," thus constituting a forbidden "gift or donation by way of a subsidy." *Id.* at 363, 527 P.2d at 522 (internal quotations and citations omitted).

¶18  *Wistuber* resolved the conflict between *Heiner* and *Pilot Properties.* *Wistuber* involved an agreement by a school district to relieve the president of the teachers' union from classroom responsibilities while continuing to pay a portion of her salary. 141 Ariz. at 348, 687 P.2d at 356. The agreement was intended to provide sufficient time for the union president to handle certain employee matters for the district. *Id.* Although holding that the arrangement served a public purpose, we rejected the notion that this ended the analysis. *Id*. at 348-49, 687 P.2d at 356-57. Rather, citing *Pilot Properties*, we stated that although "[t]he public benefit to be obtained from the private entity as consideration for the payment or conveyance from a public body may constitute a 'valuable consideration,'" the Gift Clause is "violated if the value to be received by the public is far exceeded by the consideration being paid by the public." *Id*. at 349, 687 P.2d at 357. We found the consideration adequate in *Wistuber* because the duties imposed on the union president under the challenged agreement were "substantial, and the relatively modest sums required to be

13

paid by the District not so disproportionate as to invoke the constitutional prohibition."  *Id*. at 350, 687 P.2d at 358.

## C.

¶19     The opinion below concluded that "*Wistuber* did not adopt [a] definitive two-prong test."  *Turken*, 220 Ariz. at 467 ¶ 32, 207 P.3d at 720; *see also id*. at 466 ¶ 27, 207 P.3d at 719 ("[W]e conclude that the supreme court itself did not adopt that test.").  The court of appeals focused on our statement in *Kromko* that the Gift Clause mandates that "[p]ublic funds are to be expended only for 'public purposes' and cannot be used to foster or promote the purely private or personal interests of any individual."  *Id*. at 462 ¶ 14, 207 P.3d at 715 (quoting *Kromko*, 149 Ariz. at 321, 718 P.2d at 480).  The court of appeals interpreted *Kromk*o as mandating a third inquiry:  Do "the means chosen by [the] public body to achieve a public purpose violate the Gift Clause by unduly promoting private interests"?  *Turken*, 220 Ariz. at 467 ¶ 33, 207 P.3d at 720.

¶20     Although the language quoted from *Kromko* reflects a core Gift Clause principle, that case did not modify the *Wistuber* test.  The language originated from *Walled Lake Door*, 107 Ariz. at 549, 490 P.2d at 555, which preceded *Wistuber*. More importantly, our public purpose analysis in *Kromko* did not turn on whether a governmental action "unduly" promoted private interests.  Rather, in concluding that the transfer of the

14

university hospital from the Board of Regents to a nonprofit corporation served a public purpose, we focused on the existence of public benefits, such as the corporation's promise to continue to operate the facility as nonprofit hospital open to the public. *Kromko*, 149 Ariz. at 321, 718 P.2d at 480. We also noted that the Board of Regents retained extensive control over the corporation and that, upon corporate dissolution, the hospital reverted to the Board. *Id.*

¶21    In focusing on whether a public expenditure "unduly promot[es] private interests," the opinion below effectively adopted Justice Cameron's *Wistuber* dissent, which proposed a "primary/incidental benefit" Gift Clause test, forbidding transactions in which the private entity is the primary beneficiary. *Wistuber*, 141 Ariz. at 352, 687 P.2d at 360 (Cameron, J., dissenting); *see Turken*, 220 Ariz. at 469-70 ¶ 42, 207 P.3d at 722-23 (finding the Parking Agreement invalid because it will "directly promote CityNorth's private purposes, with only indirect benefits to the City"). In *Wistuber*, however, this Court rejected that approach in favor of a simpler question: Does the expenditure, even if for a public purpose, amount to a subsidy because "[t]he public benefit to be obtained from the private entity as consideration . . . is far exceeded by the consideration being paid by the public"? 141 Ariz. at 349, 687 P.2d at 357. *Kromko* took a similar approach, analyzing

15

the adequacy of consideration issue only after finding the requisite public purpose.  149 Ariz. at 321-22, 718 P.2d at 480-81.

¶22      We adhere to that straightforward approach today. When a public entity purchases something from a private entity, the most objective and reliable way to determine whether the private party has received a forbidden subsidy is to compare the public expenditure to what the government receives under the contract.[4]  When government payment is grossly disproportionate to what is received in return, the payment violates the Gift Clause.  We therefore analyze whether the Parking Agreement violates the Gift Clause under the two-pronged *Wistuber* test.

### III.

### A.

¶23      No party questions that payments by the City under the Parking Agreement would serve a public purpose.  The parties agree that providing parking is a legitimate public purpose and that the City could have erected a parking structure of its own without violating the Gift Clause.  *See Walled Lake Door*, 107 Ariz. at 549-50, 490 P.2d 555-56 (rejecting Gift Clause

---

[4]   *Wistuber* did not, nor do we today, deal with non-contractual public expenditures, such as direct assistance to the needy. In such circumstances, the private party does not promise to do anything in return, and there thus is no occasion to analyze adequacy of consideration.

16

challenge because the municipality retained ownership of water line). It follows that, rather than building a garage, the City may instead pay for spaces inside the CityNorth garages for public use.

¶24 The City contends that the Parking Agreement also serves several indirect public purposes. It argues that because NPP may have been unable to complete its planned retail component absent the Agreement, the transaction will serve to increase the City's tax base. The City also asserts that the Agreement will produce denser development, decreased pollution, and employment opportunities for city residents.

¶25 While conceding that these goals were "legitimate purposes for the City to pursue," the court of appeals questioned whether such "indirect" benefits, no matter how substantial, can suffice to establish that the Parking Agreement serves a public purpose. *Turken*, 220 Ariz. at 471 ¶ 47, 207 P.3d at 724. Our cases, however, do not draw this bright line.

¶26 In *White*, for example, we found a public purpose for a municipality's expenditure to join the Arizona Municipal League, deeming it a "reasonable effort to learn the manner in which complex municipal problems . . . are being solved in sister cities of the state, thereby improving the quality of service [Glendale] renders its own taxpayers." 67 Ariz. at 240, 194 P.2d at 441. The benefits derived from League membership might

17

well have been characterized as indirect, but this court emphasized that "[t]he trend of authority in more recent years has been in the direction of permitting municipalities a wider range in undertaking to promote the public welfare or enjoyment." *Id.* at 237, 194 P.2d at 439 (internal citations and quotation marks omitted).

¶27    Other decisions are to the same effect. *Industrial Development Authority of Pinal County* involved an attack under the Gift Clause on a public agency's issuance of bonds, the proceeds of which were loaned to a copper company to purchase and install air pollution control facilities. 109 Ariz. at 371, 509 P.2d at 708. We found this an "expenditure in the public interest," *id.* at 373, 509 P.2d at 710, noting that the "obvious public purpose sought to be accomplished . . . is the protection of the health of the citizens of this state," *id.* at 374, 509 P.3d at 711. In so ruling, we also noted that the issuance of bonds for industrial development in general was consistent with the Gift Clause. *Id*. at 373-74, 509 P.3d at 710-11; *see also Humphrey*, 55 Ariz. at 387, 102 P.2d at 87 (rejecting Gift Clause attack on slum clearance projects funded by bonds).

¶28    In taking a broad view of permissible public purposes under the Gift Clause, we have repeatedly emphasized that the primary determination of whether a specific purpose constitutes a "public purpose" is assigned to the political branches of

18

government, which are directly accountable to the public. *See, e.g.*, *Wistuber*, 141 Ariz. at 349, 687 P.2d at 357; *White*, 67 Ariz. at 237, 194 P.2d at 439. We find a public purpose absent only in those rare cases in which the governmental body's discretion has been "unquestionably abused." *White*, 67 Ariz. at 237, 194 P.2d at 439.

¶29      In this case, we cannot conclude that the City Council "unquestionably abused" its discretion in determining that the Parking Agreement had a public purpose. The Agreement thus satisfies the first prong of the *Wistuber* test.[5]

**B.**

¶30      When public funds are used to purchase something from a private entity, finding a public purpose only begins the constitutional inquiry. *Wistuber* also requires us to examine the "consideration" received from the private entity. The Gift Clause is violated when that consideration, compared to the expenditure, is "so inequitable and unreasonable that it amounts to an abuse of discretion, thus providing a subsidy to the

---

[5]      As the court of appeals correctly noted, the Gift Clause public purpose requirement differs from the mandate under Article 2, Section 17 of the Arizona Constitution that private property be taken only for "public use" through eminent domain. *Turken*, 220 Ariz. at 469 ¶ 37 n.17, 207 P.3d at 722 n.17; *see Bailey v. Myers*, 206 Ariz. 224, 76 P.3d 898 (App. 2003) (addressing "public use" under Article 2, Section 17).

private entity." *Wistuber*, 141 Ariz. at 349, 687 P.2d at 357 (internal citations and quotation marks omitted).

**¶31** The term "consideration" has a settled meaning in contract law. It is a "performance or return promise" that is "bargained for . . . in exchange for the promise of the other party." *Schade v. Diethrich*, 158 Ariz. 1, 8, 760 P.2d 1050, 1057 (1988) (citing Restatement (Second) of Contracts § 71 (1981)). In other words, consideration is what one party to a contract obligates itself to do (or to forbear from doing) in return for the promise of the other contracting party. *Id.*

**¶32** Under contract law, courts do not ordinarily examine the proportionality of consideration between parties contracting at arm's length, leaving such issues to the marketplace. *See, e.g.*, *Sun World Corp. v. City of Phoenix*, 166 Ariz. 39, 42, 800 P.2d 26, 29 (App. 1990). In contrast, our Gift Clause jurisprudence quite appropriately focuses on adequacy of consideration because paying far too much for something effectively creates a subsidy from the public to the seller. *See Wistuber*, 141 Ariz. at 349-50, 687 P.2d at 357-58; *Kromko*, 149 Ariz. at 321-22, 718 P.2d at 480-81. The potential for a subsidy is heightened when, as occurred here, a public entity enters into the contract without the benefit of competitive proposals.

¶33     In finding that the Parking Agreement satisfied the *Wistuber* test, the superior court viewed the relevant consideration as not only the value of the parking places obtained by the City, but also indirect benefits, such as projected sales tax revenue.  The court erred in that analysis. Although anticipated indirect benefits may well be relevant in evaluating whether spending serves a public purpose, when not bargained for as part of the contracting party's promised performance, such benefits are not consideration under contract law, *Schade*, 158 Ariz. at 8, 760 P.2d at 1057, or the *Wistuber* test.   In evaluating a contract like the Parking Agreement, analysis of adequacy of consideration for Gift Clause purposes focuses instead on the objective fair market value of what the private party has promised to provide in return for the public entity's payment.

¶34     A hypothetical illustrates the point.  Assume that a municipality must repair a sewer line.  If the line is not repaired, disease will likely break out and spread quickly, causing deaths and significant public health care expenditures. Several competent contractors are willing to do the repair for $5,000.  Under the City's reasoning, the municipality could pay a contractor $5 million without violating the Gift Clause because the indirect benefits from the repair — saved lives and avoided health care costs — exceed the $5 million payment.

21

¶35    We disagree that this should be the result.  The Gift Clause prohibits subsidies to private entities, and paying far more than the fair market value for the repair plainly would be a subsidy to the contractor.  Similarly, if the City's payments to NPP under the Parking Agreement are grossly disproportionate to the objective value of what NPP has promised to provide in return, the consideration prong of the *Wistuber* test has not been satisfied.

1.

¶36    We therefore turn to the consideration provided for in the Parking Agreement.  The Agreement is clear — the City has agreed to pay up to $97.4 million for the non-exclusive use of some 2,980 parking garage spaces and the exclusive use of 200 park-and-ride spaces.  NPP made no other promises.

¶37    To be sure, the City's obligation to make payments under the Agreement does not commence until NPP has developed a specified amount of retail space.  However, the Agreement makes plain that NPP has no contractual obligation to build the retail component, characterizing retail construction as "a condition precedent of the City's obligation to pay the Use Payment and not a covenant of the Developer."

¶38    As the City notes, the payments for the parking spaces under the Agreement are based on the taxes generated at the development.  But the Agreement does not obligate NPP to produce

22

a penny of tax revenue for the City. Rather, the duty of CityNorth and its tenants to pay taxes arises from law applicable to all, not out of contract.

¶39    In short, the only consideration flowing to the City from NPP under the Parking Agreement is the right to use the parking spaces. Under *Wistuber*, the relevant inquiry is whether the amount the City has agreed to pay for use of those spaces is grossly disproportionate to what it will receive.

## 2.

¶40    The Parking Agreement obligates the City to pay up to $97.4 million for the parking spaces. The City argues that its payments cannot be a gift or subsidy under the Gift Clause, because they will be offset by tax revenues from the CityNorth project. But this argument misses the point. Once collected, these tax revenues are public funds. Whether the subsequent expenditure of those funds is consistent with the Gift Clause depends on what the City receives in return under the Parking Agreement.

¶41    The City and NPP also argue that compliance with A.R.S. § 9-500.11, which requires that anticipated tax revenues exceed any tax incentives, establishes compliance with the Gift Clause. Of course, as the court of appeals noted, statutory compliance does not automatically establish constitutional compliance. *Turken*, 207 Ariz. at 469 ¶ 37, 207 P.3d at 722.

23

But, more importantly, the argument conflates the different requirements of the Gift Clause and the statute. The Constitution requires that the *consideration* received by the City not be grossly disproportionate to the amount paid to the private entity. The statute imposes a separate and additional requirement – municipalities entering into tax incentive agreements must certify that the anticipated *increase in tax revenues* exceeds the proposed expenditure. A.R.S. § 9-500.11(D)(1). The statute may be satisfied even though tax revenues are not consideration for *Wistuber* purposes. Conversely, even when a transaction meets the second *Wistuber* prong, the statute requires more – that anticipated tax revenues exceed any expenditure.[6]

### 3.

**¶42** Thus, the remaining question is whether the $97.4 million that the City has promised to pay far exceeds the value of the parking places promised in return. Turken has conceded that $97.4 million might well be a fair payment for exclusive use of 3,180 spaces over the next 45 years. The Parking Agreement, however, gives the City exclusive use of only 200 spaces. Nothing in the Agreement prevents CityNorth customers

---

[6] Recent legislation bans municipal tax incentives for relocating retail businesses in certain metropolitan areas, including Maricopa County. A.R.S. § 42-6010 (Supp. 2008).

from filling up the other 2,980 spaces when other members of the public might most want to use them.

¶43     We find it difficult to believe that the 3,180 parking places have a value anywhere near the payment potentially required under the Agreement.  The Agreement therefore quite likely violates the Gift Clause.  However, because the superior court viewed projected sales tax revenue and other indirect benefits as consideration for *Wistuber* purposes, it never separately addressed the value of the parking places.  We are not finders of fact, and our intuitions as to proportionality, however strong, cannot substitute for specific findings of fact. Thus, under normal circumstances, we would be constrained to remand to the superior court.

**4.**

¶44     A remand, however, is not necessary in this case. Although "[n]ormally our decisions in civil cases operate retroactively as well as prospectively," *Lowing v. Allstate Ins. Co.*, 176 Ariz. 101, 108, 859 P.2d 724, 731 (1993), "[w]hether an opinion will be given prospective application only is a policy question within this court's discretion," *Fain Land & Cattle Co. v. Hassell*, 163 Ariz. 587, 596, 790 P.2d 242, 251 (1990).  In addressing retroactivity, we consider several factors, including whether our opinion overrules settled precedent, "establishes a new legal principle . . . whose resolution was not

25

foreshadowed," or whether "[r]etroactive application would produce substantially inequitable results."  *Lowing*, 176 Ariz. at 108, 859 P.2d at 731.

¶45    We today overrule no prior decision.  But we recognize that the consideration prong of the *Wistuber* test has been widely misunderstood during the past two decades and that our cases have never squarely addressed that issue.  The able trial judge believed that indirect benefits satisfied the *Wistuber* consideration prong and no party appears to have directly argued to the contrary below.  Moreover, various *amici* have claimed that a number of public-private transactions were entered into since *Wistuber* under a similar misapprehension.

¶46    To some extent, this confusion may have arisen from our statement in *Wistuber* that "[t]he public *benefit* to be obtained from the private entity as consideration for the payment or conveyance by a public body may constitute a 'valuable consideration.'"  141 Ariz. at 349, 687 P.2d at 357 (emphasis added).  Despite this statement, *Wistuber* did not hold that all public benefits constituted consideration.  Rather, our opinion focused solely on the value of the duties imposed on the union president under the challenged agreement – the consideration promised directly in return for the salary paid by the school district.  *Id.* at 350, 687 P.2d at 358.  Nonetheless, municipalities may have understood the "public benefit" language

26

to suggest a broader view of "consideration." *Cf. Kotterman v. Killian*, 193 Ariz. 273, 288 ¶ 51, 972 P.2d 606, 621 (1999) (citing *Wistuber* for the proposition that "[w]e have upheld giving when the state action served a public purpose and adequate consideration was provided for the public benefit conferred").

¶47    Confusion may also have been caused by the statement in *Wistuber* that a "panoptic view of the facts of each transaction is required." *Id.* at 349, 687 P.2d at 357. As *Wistuber* noted, *id.*, this language came from *State v. Northwestern Mutual Insurance Co.*, 86 Ariz. 50, 54, 340 P.2d 200, 202 (1959). That case involved the return of excess premiums by a mutual insurance company to its members, including a school district, in years during which claims were lower than anticipated. *Northwestern Mutual* used the term "panoptic" in rejecting the contention that the initial premium payments violated the Gift Clause. *Id.* at 54-55, 340 P.2d at 202-03. The language was thus meant to reject an overly technical view of the transaction. By reiterating in *Wistuber* that a "panoptic" view is required, we did not mean to suggest that something that is not consideration under contract law is somehow transformed into such for Gift Clause purposes.

¶48    The confusion may have been exacerbated by the statement in *Kromko* that "perpetuation of the critical

27

educational relationship between the hospital and the University of Arizona College of Medicine" can be counted as consideration. 149 Ariz. at 322, 718 P.2d at 481. Read out of context, this language could suggest that indirect public benefits are consideration. In *Kromko*, however, the perpetuation of the educational relationship was directly contracted for in exchange for the conveyance of the hospital to the nonprofit corporation, *id.* at 320, 718 P.2d at 479, and thus plainly qualified as traditional consideration.

¶49     In short, although neither *Wistuber* nor *Kromko* held that indirect benefits enjoyed by a public agency as a result of buying something from a private entity constitute consideration, we understand how that notion might have been mistakenly inferred from language in our opinions. We therefore believe it appropriate to limit today's clarification of the consideration test to transactions occurring after the date of this opinion.

**IV.**

¶50     For the reasons above, we vacate the opinion of the court of appeals. Because we apply our clarification of the *Wistuber* consideration test prospectively, we affirm the superior court's dismissal of Turken's Gift Clause claim.[7] The

---

[7]     Turken's supplemental brief sought attorneys' fees in this Court. But, even assuming *arguendo* that Turken was the prevailing party, *cf. Wagenseller v. Scottsdale Mem'l Hosp.*, 147 (continued...)

28

court of appeals did not reach Turken's other constitutional arguments, and we therefore remand to the court of appeals to consider those issues in the first instance.


_____
Andrew D. Hurwitz, Vice Chief Justice


CONCURRING:


_____
Rebecca White Berch, Chief Justice


_____
Michael D. Ryan, Justice


_____
W. Scott Bales, Justice


_____
A. John Pelander, Justice


_____

Ariz. 370, 394, 710 P.2d 1025, 1049 (1985) (holding that party establishing important point of law may be considered as successful for purposes of fee award even if it eventually does not recover in the litigation), the request for fees was untimely. *See* Ariz. R. Civ. App. P. 21(c)(1) (requiring request for attorneys' fees to be made in response to petition for review). The court of appeals is free to consider the award of fees to Turken on remand.